HERMAN V. VON HOLT *v.* IZUMO TAISHA KYO MISSION OF HAWAII, AN INCORPORATED ASSOCIATION, JOHN H. WILSON, LEON K. STERLING, THE CITY AND COUNTY OF HONO- LULU, A MUNICIPAL CORPORATION.

No. 3047.

ARGUED DECEMBER 6, 1956.          DECIDED AUGUST 6, 1958.

RICE, C. J., STAINBACK, J., AND CIRCUIT JUDGE FAIRBANKS IN PLACE OF MARUMOTO, J., DISQUALIFIED.

OPINION OF THE COURT BY RICE, C. J.

This is a taxpayer's suit to have a "purported conveyance," executed in the name of the City and County of Honolulu, a municipal corporation, as grantor, to an eleemosynary corporation, as grantee, set aside, cancelled, and declared null and void and of no effect.

On October 14, 1953, the petitioner-appellant, hereinafter referred to as the appellant, of and for himself and on behalf of all the taxpayers of the City and County of Honolulu, Territory of Hawaii, of which he alleged himself to be one of the class, filed a petition in the circuit court, first circuit, Territory of Hawaii, addressed to the Honorable, the presiding judge, of the said court, at Chambers, in equity, and naming respondents-appellees herein, Izumo Taisha Kyo Mission of Hawaii, an incorporated association, John H. Wilson, Leon K. Sterling, and the City and County of Honolulu, a municipal corporation, as respondents thereto.

The proceeding in the lower court was given equity number 5870, summons was issued pursuant to the peti-

674

tion and the several respondents were duly served.

In his petition, the appellant alleged, in substance, as follows:

I. Petitioner is a citizen of the United States of America and a resident and taxpayer in and of the City and County of Honolulu, Territory of Hawaii, owning real property within said City and County of Honolulu, on which he pays real property taxes.

II. The respondent Izumo Taisha Kyo Mission of Hawaii is an eleemosynary corporation, incorporated under the laws of the Territory of Hawaii on July 2, 1952; respondent City and County of Honolulu is a municipal corporation of the Territory of Hawaii; respondent John H. Wilson is (was) and has (had) been the mayor of the City and County of Honolulu since January 2, 1947; and respondent Leon K. Sterling is (was) and has (had) been the clerk of the City and County of Honolulu since prior to January 2, 1947.

III. On and prior to the 24th day of December, 1952, respondent City and County of Honolulu was the owner of those certain lands and improvements thereon situate at the East end of Leleo lane, at Kouiu, Honolulu, T. H., being a portion of the property 2465, L. C. Aw. 732 to Kuinui and a portion of L. C. Aw. 6236 to Kaaiawaawa, as more particularly described in detail, containing an area of 14,612 square feet; together with a non-exclusive easement of ingress and egress; as shown on "Map 1," filed in the office of the assistant registrar of the land court of the Territory of Hawaii with land court application number 1292, of Izumo Taisha Kyo Mission of Hawaii, and being all of the land described in original certificate of title number 22,508 issued to Izumo Taisha Kyo Mission of Hawaii. The said lands and improvements thereon being covered by transfer certificate of title number 31,517 recorded in the office of the assistant registrar in book 316

at page 65 and being on and prior to December 24, 1952, under the control and management of the board of public parks and recreation of the City and County of Honolulu for use as park and recreation facilities.

IV. Said board of public parks and recreation, in the year 1949, while said lands were under its control and management, as aforesaid, did expend the sum of $22,000.00 for capital improvements on said premises, which said sum was derived from the general funds of the respondent City and County of Honolulu.

V. Said lands and improvements thereon, as an integral part of the respondent City and County of Honolulu's park and recreation facilities, fill an urgent need for such facilities in the Palama area of Honolulu, there being no other nearby public park or recreation facilities.

VI. On the 24th day of December, 1952, the respondent John H. Wilson, as mayor, and Leon K. Sterling, as clerk, executed a certain document identified as land court number 145182, filed with the assistant registrar of the land court of the Territory of Hawaii at 4:28 o'clock P. M., on said date, such document purported to be a deed from the respondent City and County of Honolulu to the respondent Izumo Taisha Kyo Mission of Hawaii, of all of the lands and improvements thereon described in paragraph "III," above, including said capital improvements described in paragraph "IV" above.

VII. The Izumo Taisha Kyo Mission of Hawaii paid to the City and County of Honolulu the sum of $2,478.55, purportedly as consideration for the purported conveyance.

VIII. The purported consideration of $2,478.55 is a grossly inadequate consideration for said lands and improvements thereon, making such purported conveyance in reality a gift of public property to the respondent Izumo Taisha Kyo Mission of Hawaii.

IX. The purported conveyance was ultra vires and

contrary to law for reasons "each of which being sufficient unto itself," as follows:

a. It was contrary to the provisions of section 6521(33), R. L. H. 1945, in that the purported conveyance was not the result of sale by public auction after publication of notice of such auction, as required by said section 6521(33), but was instead the result of private sale.

b. Said purported conveyance was contrary to law in that it was for a grossly inadequate consideration, being in reality an unauthorized gift of public property, and a constructive fraud upon the petitioner and the class he represents.

X. A formal appeal to the respondents to cancel said conveyance or otherwise nullify the same would be of no avail to petitioner and the class he represents for the following reasons:

a. John H. Wilson and Leon K. Sterling, in executing said document did so against the advice of the acting city and county attorney of Honolulu, who by law is obligated to represent the class which petitioner represents herein.

b. The present city and county attorney has refused and still refuses to represent the board of public parks and recreation and to protect the interests of the petitioner and the class he represents.

c. The board of supervisors of the City and County of Honolulu has refused and still refuses to authorize the board of public parks and recreation to engage special counsel for the purpose of representing and protecting the interests of petitioner and the class he represents.

XI. The petitioner and the class he represents have no plain, adequate or complete remedy at law.

XII. The petitioner and the class he represents will be irreparably damaged if the prayer of the petition is not granted, because:

"1. The said lands and improvements thereon are

a valuable and useful portion of the system of public parks and recreation areas of the City and County of Honolulu, supported and maintained by taxation of Petitioner and the class he represents, and will be lost to the Petitioner and the class he represents, necessitating further expenditure of public funds for acquisition of urgently needed property in the Palama area of Honolulu to replace the property described in Paragraph III above, there being no other public parks or recreation areas in the general vicinity of said property."

The petition concluded with the prayer by the petitioner for the issuance of process, citing and summoning respondents to appear in answer to the petition according to law; that upon a full hearing, the said purported conveyance be set aside, cancelled, and declared null and void and of no effect; that the respondent City and County of Honolulu be ordered to pay to respondent Izumo Taisha Kyo Mission of Hawaii the sum of $2,478.55; and for such other and further relief as the court shall seem meet and proper.

The respondents-appellees will hereinafter be referred to collectively as the appellees, or individually as the Mission, City, John H. Wilson, or Leon K. Sterling.

The Mission, on its own behalf, John H. Wilson and Leon K. Sterling, on their behalf, and the City on its behalf, filed separate demurrers, the respondents submitted memoranda in support thereof and the petitioner a memorandum in opposition. After consideration of the memoranda and arguments of counsel, the judge presiding in the matter made a finding and ruling: (1) that the petition states facts sufficient to constitute a cause of action in which equity jurisdiction may be invoked; (2) that it contains sufficient allegations to show constructive fraud upon the part of the respondents, which if properly sub-

stantiated would be a basis for setting aside the conveyance; (3) that the petitioner and respondents are necessary and proper parties to the suit; and (4) that there is sufficient clarity in the allegations to properly inform the respondents of the basis of petitioner's action against them; and overruled the demurrers filed by the respective respondents.

On June 14, 1954, the Hawaii Rules of Civil Procedure (H. R. C. P.) became effective and applicable to suits of a civil nature whether cognizable as cases at law or in equity.

On July 1, 1954, the Mission, Leon K. Sterling, John H. Wilson, and the City, each, separately, filed an answer in the lower court.

In substance, the answer of the Mission admitted that the petitioner is a citizen of the United States of America, a resident, taxpayer and owner of real property, on which he pays real property taxes, in the City and County of Honolulu, Territory of Hawaii; admitted the facts alleged in paragraph II of the petition other than and excepting the statement that it was incorporated under the laws of the Territory of Hawaii on July 2, 1952, and contra stated "* * * the act of July 2, 1952, was a re-incorporation of the Izumo Taisha Kyo Mission of Hawaii." It admitted the matters alleged in paragraph III, *supra,* of the petition; alleged that it was without knowledge and information to form a belief as to the truth of the allegations and averments of paragraph IX and of paragraph V of the petition; admitted the truth of all matters pleaded in paragraph VI, "except for the conclusion to the effect that alleged capital improvements were made on and concerning the land and the appurtenances" and as to the same stated that it was without knowledge and information sufficient to form a belief; denied the matters pleaded in paragraph VII of the petition and in answer thereto stated

that the Mission paid and otherwise transferred the sum of $2,478.55 to the City, "but such payment and transfer of monies was not the consideration for the conveyance of the land in question." As to paragraph VIII of the petition, the answer of the Mission denied all the matters pleaded therein and said the sum of $2,478.55 "was not in any manner consideration for the reconveyance of the land in question and pleads that the title to the said land was wrongfully and illegally acquired by the respondent City and County of Honolulu through a mistake of law and of fact and that at the time of the illegal conveyance to the respondent City and County of Honolulu, the Board of Supervisors assumed certain obligations, liabilities and indebtednesses of the respondent mission, the Izumo Taisha Kyo Mission of Hawaii, to the extent and in the sum of" $2,478.55, and that the Mission in paying and transferring the sum of $2,478.55 to the City, repaid the latter "for the obligations, liabilities and indebtednesses that it undertook and thereby restored" to the City "the financial status that existed before the City and County of Honolulu assumed the said obligations, liabilities and indebtednesses mistakenly, wrongfully and illegally. That, for these reasons the said sum of money was not consideration for the re-conveyance of the land in question." It, the Mission, further denied that "the re-conveyance" was a gift of public property and alleged that the property "was not public property and such re-conveyance was not a gift for the reasons set forth above * * *."

The answer of the Mission denied all of the matters pleaded in paragraph "IX" of the petition and stated "as a part of its affirmative defense":

(1) That the conveyance in question was not ultra vires nor contrary to the law; that the original conveyance "by the respondent Izumo Taisha Kyo Mission of Hawaii" to the City "was an illegal transfer based upon a mistake of fact and of law, and"

(2) "That if the said conveyance was and is denied to be legal and binding, then" the City acted within the powers and authority conferred upon it by the laws and statutes of the Territory of Hawaii and the Mission stated its reliance upon Section 6769 of the Revised Laws of Hawaii 1945 as amended by Act 237, S. L. H. 1945, and also Act 97, S. L. H. 1945, amending Section 6521, R. L. H. 1945, as amended by adding a new subsection 35-A, and

(3) "That Section 6521 (33) of the Revised Laws of Hawaii 1945 cited and relied upon the petition has been amended by Act 97 of the Session Laws of Hawaii 1945, and therefore, the allegations and conclusions pleaded in Paragraph IX, subparagraph (a), are incompletely pleaded and is inapplicable, and"

(4) "That all the provisions in the laws cited above as Act 237 of the Session Laws of Hawaii 1945 and Act 97 of the Session Laws of Hawaii 1945 were fully and completely complied with by the Honorable Mayor and the Board of Supervisors, and hence, such transfer of land was not ultra vires nor contrary to law. Further that the transfer of land was approved by a resolution of the Board of Supervisors voting unanimously the return of the property to the respondent Izumo Taisha Kyo Mission of Hawaii after a full and complete public hearing beginning on or about August 26, 1952, and continuing until October 27, 1952."

As to paragraph X of the petition, the answer of the Mission stated that it was without knowledge and information to form a belief as to the truth of the allegations and averments thereof; denied that the petitioner "and/or the class he purports to represent has no plain, adequate or complete remedy at law." It stated that the Mission was without knowledge and information to form a belief as to the truth of the allegations and averments of paragraph XII of the petition. Further, the answer of the

Mission pleaded affirmatively that the petitioner was barred by the defense of laches "by reason of his neglect and delay to enforce his alleged right as a taxpayer."

The answer of Leon K. Sterling was in substance to the effect that he was without knowledge and information sufficient to form a belief as to the truth of the allegation in paragraph I of the petition; admitted that he was the incumbent clerk of the City and County of Honolulu since prior to January 2, 1947; admitted that the City, on and prior to the 24th day of December, 1952, was the holder of title to the lands and improvements thereon "situate at the east end of Leleo Lane, at Kouiu, Honolulu, Territory of Hawaii, as more particularly described in paragraph III," of the petition, and as covered by transfer certificate of title number 31,517 recorded in the office of the assistant registrar in book 316 at page 65; and further admitted that prior to December 24, 1952, the same lands and improvements were by the City placed under the management of the board of public parks and recreation of the City for use as a public park and recreation facilities. He also admitted in his answer that the said board of public parks and recreation in the year 1949, "while said lands were under its management," expended the sum of $22,000 "for the remodeling, repair, restoration and renovation of the temple building," which expenditure was charged by the board of public parks and recreation as capital improvements on said premises and that said sum "was derived from the General Funds" of the City. He denied "that the said lands and improvements were or are an integral part of" the City's park and recreation facilities, or "fill an urgent need for such facilities in the Palama area in Honolulu, or that there is any need whatsoever for the park and playground in this particular area or that there were or are no other nearby public park and recreation facilities." He admitted that as clerk of

the City and County of Honolulu he did, on the 24th day of December, 1952, sign that certain document identified as land court document number 145182, and that the same purported to be a deed from the City to the Mission of the lands and improvements thereon described in paragraph III of the petition, "including said capital improvements referred to in paragraph VI of said Petition"; that the deed was an official document which he had signed on behalf of the City as authorized by resolution number 830, approved December 23, 1952, which was adopted by the members of the board of supervisors of the City "only after a series of hearings held before the said Board of Supervisors; that the hearings began on or about August 26, 1952 and continued until October 27, 1952." He admitted that the Mission paid to the City, "the sum of $2,478.55 designated as consideration for said conveyance"; and he denied that the said sum paid and designated as consideration was a grossly inadequate payment and also denied that the conveyance amounted to a gift of public property to the Mission and averred that the allegations in paragraph VIII of the petition are merely conclusions of the petitioner.

Further, in his answer, Leon K. Sterling denied that the conveyance referred to was ultra vires and contrary to law, alleging the provisions of Section 6521 (33), R. L. H. 1945, to not be applicable thereto, but Section 6769, R. L. H. 1945, as amended by Act 237, S. L. H. 1945, and that by the latter the board of supervisors "was and is authorized to sell, exchange or otherwise dispose of park property in the absence of park board approval by the affirmative vote of at least five members of the Board of Supervisors and in this instance, avers, as specifically expressed in the conveyance, that the members of the Board of Supervisors voted unanimously on the *return* of the property to the Respondent, Izumo Taisha Kyo

Mission of Hawaii." (Emphasis added.) He also express-
ly denied severally: that the conveyance was contrary to
law; that it was for a grossly inadequate consideration;
that it was in reality an unauthorized gift of public prop-
erty; and that a constructive fraud upon the petitioners
and the class he represents resulted from the aforemen-
tioned conveyance.

The answer admitted that no formal appeal to the City
to cancel the conveyance or to otherwise nullify the same
was made by the petitioner or any member of the class
represented by him, but denied that such an appeal would
have been of no avail to the petitioner and the class rep-
resented by him, alleging that the allegation in paragraph
X of the petition was a mere conclusion of the petitioner
and not based on facts. He admitted that in signing the
document referred to, he did so against the advice of the
acting city and county attorney of Honolulu; denied that
the board of public parks and recreation is entitled to
representation by the city and county attorney separate
and apart from the City; and admitted that the City
refused and still refuses to authorize the board of public
parks and recreation to engage special counsel for the
purpose of representing or protecting the interest of the
petitioner and the class represented by the latter. The
answer also denied that the petitioner and the class rep-
resented by him have no plain, adequate or complete
remedy at law; and further denied that petitioner and
the class represented by him would be irreparably damaged
if the petition was not granted; and denied that the lands
and improvements referred to (in the petition) are in-
dispensable portions of the public park and recreation
system of the City and that the City would necessarily
expend public funds for acquisition of other areas in
Palama to replace the property described in paragraph
III of the petition.

The answers of John H. Wilson and of the City were substantially the same as that of Leon K. Sterling, except that instead of the admission of Leon K. Sterling that he was the clerk, John H. Wilson admitted being the mayor of the City since January 2, 1947, and having as such mayor signed the document of conveyance to the Mission; and in its answer, the City admitted being a municipal corporation of the Territory of Hawaii.

On August 31, 1954, the appellant, petitioner in the court below, filed a motion for summary judgment and thereby moved the court as follows:

"1. That it enter, pursuant to Rule 56 of the Hawaii Rules of Civil Procedure, a summary judgment in Plaintiff's favor for the relief demanded in his Petition filed herein on the ground that there is no genuine issue as to any material fact and that Petitioner is entitled to a judgment as a matter of law;

"2. If summary judgment is not rendered in Petitioner's favor and a trial is necessary, that the Court, at the hearing on the motion, by examining the pleadings and the evidence before it and by interrogating counsel, ascertain what material facts are actually and in good faith controverted, and thereupon make an order specifying the material facts that appear without substantial controversy and directing such further proceedings in the action as are just.

"This motion is based upon:

"(a) The affidavit of J. Edward Lyons, attached hereto;

"(b) The Certificate of Kam Tai Lee, Treasurer of the Territory of Hawaii, attached hereto;

"(c) The pleadings and records herein;

"(d) Petitioner's Memorandum of Authorities in support hereof;

"(e) Petitioner's Exhibits marked "A" to "G" inclusive."

The record is devoid of any opposing affidavit by the appellees, or any of them, but the minutes of the lower court show that on October 18, 1954, after argument had thereon before the seventh judge presiding in the circuit court, first circuit, the court made an oral ruling denying the motion for summary judgment.

The record shows that, on November 17, 1954, a pretrial conference and general discussion as to the issues were had between court and counsel in the circuit court. However, the record is devoid of any order of court reciting the action taken at the conference, agreements made by the parties as to any of the matters considered, and limiting the issues for trial to those not disposed of by admissions or agreements of counsel. Such an order is required by Rule 16 of the Hawaii Rules of Civil Procedure. If one had been entered it might have simplified this court's appellate review of the case.

Trial commenced on December 6 and was concluded on December 7, 1954.

Before the taking of any testimony, the respondents below, now the appellees, in open court, admitted the allegations of fact as set forth in the petition in respect to the citizenship and residence of the petitioner; that he is a taxpayer in and owns real property within the City and County of Honolulu on which he pays real property taxes; that the City and County of Honolulu is a municipal corporation of the Territory of Hawaii; that the respondent John H. Wilson was the mayor and the respondent Leon K. Sterling was the clerk of the City and County of Honolulu at all times alleged in the petition. They also admitted that Izumo Taisha Kyo Mission of Hawaii is an eleemosynary corporation incorporated under the laws of the Terri-

tory of Hawaii on July 2, 1952, but disputed the legal effect of the act of incorporation.

Offered and received in evidence and marked petitioner's exhibit number 1 was a certified photostatic copy of the petition for charter of incorporation filed in the office of the treasurer of the Territory on June 23, 1952, and the charter of incorporation of Izumo Taisha Kyo Mission of Hawaii, granted on July 2, 1952.

The respondents below, who are the appellees here, admitted the allegations of paragraph III of the petition, containing a description of the property, and that the title to the property, involved herein, was in the city and county as alleged; that the property was under the control and management of the board of public parks and recreation of the City and County of Honolulu during the times mentioned in the petition, but put in issue the legal effect of the word "owner," contending that because of various facts alleged in their answers that the word "owner" in the sense used meant the holder of naked title and there are equitable interests possessed by the Mission.

It was further admitted by the respondents below, the appellees here, that the deed was executed on the 24th day of December, 1952, as alleged in paragraph VI of the petition. The only portion of paragraph VI of the petition put in issue by the respondents, appellees, is the last portion thereof being as follows: "Of all of those lands and improvements thereon described in Paragraph III above, including said capital improvements described in. Paragraph IV above." So that the execution and existence of the deed were not challenged and only that it covered the improvements, on the land described, was in issue.

A certified photostatic copy of the deed from the City to the Mission was offered and received in evidence and marked petitioner's exhibit number 2.

Two witnesses were called by and testified on behalf

of the petitioner, appellant herein. They were: J. E. Lyons, superintendent, board of public parks and recreation of the City and County of Honolulu, and Ernest Souza, tax assessor, Territory of Hawaii, for the first taxation division, the island of Oahu.

Also, on December 6, 1954, the trial judge, together with all counsel and Mr. Lyons, made a personal inspection tour of the area involved in the litigation.

Mr. Lyons, as the first witness, testified on direct examination that he had overall jurisdiction and management of the operations and affairs of the board of public parks and recreation; that many parcels, totaling some 2400 acres, of which Leleo, known as Leleo Center (the land in litigation) is one, are under the Parks Board's jurisdiction. This latter area is about one-third of an acre on which there are two structures, one formerly known as the shrine, and the other as the residence of the minister (priest) in charge of the shrine. He said that he believed that this area first came under the jurisdiction of the parks board on July 1, 1946, and at that time the buildings were poor, in disrepair, and also were arranged for other than recreational purposes. Repair, for safety, and renovation and remodeling for usage in accordance with the park's program was necessary. The property was "in pretty bad shape," and a contract for repair, renovation and remodeling of the building was let in 1948 or 1949. The capital expenditure by way of a contract amounted to $18,504.75, inclusive of a contingency allowance of $1,500 plus an additional sum for extras. The contingency fund was set up for the purpose of compensating for such contingencies as badly termite infested areas which on the surface looked fine but when worked upon were found to be so infested that pieces had to be taken out entirely and replaced with new material and work.

Asked how much of the expenditures would, to the

best of his recollection, be considered in the nature of annual maintenance expenditures, the witness Lyons said, "None."

Responsive to questioning the witness located the site of Leleo center as being at the junction of King and Beretania streets and testified that the nearest other public park or area under jurisdiction of the parks board is Aala park and playground; and as to the distance of Leleo center from the junction of Dillingham boulevard and Beretania street, "a distance of possibly three normal blocks, possibly four blocks."

He testified that Leleo center is only the second or third area classified by the parks board as a "center." "That is where the people are provided with services in a building, such as the conducting of crafts, community group meetings of all age youngsters, as well as all age groups, music lessons, dramatic activities in the building. The Scouts of that particular area use it, as well as other groups. We have music and hula. * * * The Board of Health as a matter of cooperation, that the second unit that we have in which the Board of Health participates in the use of one of the rooms there, I believe twice a week or so, in conducting its family nursing service for the people of that particular district."

Responsive to further questioning, the witness mentioned numerous activities which were carried on at the Leleo center in one or the other of the two buildings which had been respectively a temple and an adjoining building.

Asked if the parks board would have to utilize Aala park for the same functions that are carried on at Leleo, what would have to be done in order to make Aala park suitable for those functions, the witness, Lyons testified as hereinafter quoted:

"Well, obviously we would have to have the structures. We will have to. I might state that in the

thinking of the Parks Board the lay-out itself would not be suitable.

"Q For what reason?

"A Because of the nature and the character of the people that are frequenting Aala Park. In that section the parks are so scarce that we must necessarily have what is known as a park for the people, and there is hundreds of them who are unemployed, who are retired, or who have nothing else to do during the day.

"Q But you keep them out of Leleo, don't you?

"A Oh, yes, very definitely."

Offered and received in evidence and marked petitioner's exhibit number 3 is a map which the witness testified that possibly shows two-thirds or more of 2,400 acres of park area under control of the parks board.

Questioned as to the number of persons using Leleo center, the witness testified that he had a report from the recreation department telling that in 1949 there were 21,706 participants and 2,085 spectators.

Asked how he defined the several thousand spectators mentioned, the witness said:

"Well, they generally are the parents or the older brothers and sisters who come along there and watch the programs and in that way feel satisfied that their youngsters are being given something that is beneficial as well as being properly taken care of while they are away from home. * * * the parent doesn't come to all the classes. They come there occasionally, and if they are satisfied that the program is one that is beneficial to their youngsters, they may not come along again unless there is a special event that takes place in which their youngsters may be participants. * * *."

Asked whether he could give figures for any other years (than 1949), the witness said:

"Well, 1950 we had 32,759 participants and 430

spectators. That is an awful difference, but that is the way it was. In 1952 it fell to 19,733 participants and 1,268 spectators. In 1954 there was 21,773 participants and 2,180 spectators."

In 1954 the figures only ran "Through August."

Asked whether the parks board had made any plans for what it will do if Leleo center is no longer available, the witness testified:

"No, there are no plans for that area at all. We had a plan of increasing the area itself by purchase, but now with the redevelopment agency coming in that section, the control of the development of that whole section is out of our hands, excepting to the extent that when the program goes forward the city through its Parks Board is expected to contribute real property for that purpose to provide play areas in the new redevelopment scheme.

"Q In other words, if and when this Redevelopment Agency program goes through Leleo Center will be torn down to make room for the redevelopment?

"A It will be torn down to make room for the redevelopment.

"Q And the Parks Board's contribution toward this new development will be the area of Leleo Center?

"A That's right. And I might state I don't know whether it is enough extra or not. There is no way of knowing at this time whether the Redevelopment will take that particular area itself, or whether it would give us some area that they take in exchange for it; but in any event the City must contribute part of the land required by the Redevelopment. If we didn't have the land, the City would, in the final event, be required to purchase or pay for that particular section of the land that would provide the playground."

After the witness Lyons had testified at length on

direct examination he was cross-examined at considerable length as to what structural changes were made in the buildings on the premises in litigation after the parks boards had obtained control of the premises. It is apparent from the transcript that the trial judge and the counsel for the respondents, appellees, felt that the parks board's classification of the whole expenditure for conversion of the property for use as a "center" as a capital expenditure from the parks board's point of view may have been in accord with the board's accounting system, but was too inclusive and contra to general accounting practices, because the lump sum paid for the conversion purposes included such items as plumbing, paving, a retaining wall, etc.

After a view of the premises by the court, counsel and Mr. Lyons, the latter was allowed to correct some of his testimony and testify further on direct examination because the view of the premises had refreshed his memory. He then testified as hereinafter stated.

Work done in the temple consisted of the replacement of railing, replacement of posts, replacement of floor joists. There was not any installation of cabinet work in the temple. Summarizing the expenditures on the adjoining building, he testified that they covered roofing, a new roof on the building, the tearing down of partitions of old rooms and reconverting into larger rooms used as a library and as a playroom, possibly not the latter but as a classroom. There was the laying of new asphalt tile floor; construction of shelves, cabinets and tables; a complete new toilet for girls and women; the installation of a new kitchen on the top floor, and the installation of a closet to the bedroom, the stairway was reversed for greater convenience of access; there was a complete reinstallation of new wiring and lighting fixtures for the building.

Adverting to the temple, he said there was the in-

stallation of fifteen windows where there had formerly been just large aperture with neither glass nor sash in them. There was also a certain amount of new wiring and lighting fixtures installed in the temple itself. There was a wire mesh fence installed around the property, on the Ewa side, as well as a small section on the Waikiki side.

"Q And the items you have mentioned, together with the construction of a large retaining wall along the entire mauka boundary, pretty well summarizes the actual expenditures made on the property, does it not?
"A As well as the laying of concrete flooring in the basement and along the mauka boundary of the property.

"Q Now the items you have mentioned, plus the installation of a closet in what is the carpentry shop in the basement of the smaller adjoining building, does that complete the items that were done at that time?
"A To the best of my knowledge."

Upon further cross-examination as to an item of $2,993.50 for painting, the witness Lyons testified that item included the paint as well as the salaries of the painters doing the work and it involved the painting of the house, more or less, the temple was not painted to any great extent. Questioned as to an item of $1,600 listed as for cabinets, the witness Lyons was asked whether such could be removed. He answered: "I should think about 50% — No, even less than that. The others may be removed, although it is attached to the building."

Ernest Souza, as the second witness for petitioner, testified that as a tax assessor of the Territory of Hawaii, the first taxation division, the island of Oahu, was within his jurisdiction and in the course of his duties he was required to assess the properties owned by the government

and by charitable institutions, for value, even though they are not subject to tax.

He said that he had with him the records of the appraisals of the property known as Leleo center, an area of 14,612 square feet assessed at 75 cents, making a tax value of $10,959, which tax value represented sixty percent of the fair and reasonable market value. He had calculated what on that basis the market value would be for the land and it would be $18,265. Improvements in 1952 were assessed at $16,654, tax value; market value would be $27,812, or — land and improvements together — a total market value of $46,077.

In 1952 there was a re-evaluation and an increase on all buildings of .676. The main building (the temple) was assessed at $7,884; then there was the outside part thereto assessed at $528; building number two was assessed at $1,495 and the garage at $30; the total was $9,937, and with an increase of .676 it brought it up to $16,654.00.

Upon cross-examination, the witness, Souza, said he had a record of valuations from 1946 to date, 1954. The assessed value was $7,884 in 1947. In 1952 the assessment was at the same figure with an increase of .676, roughly two-thirds of one percent.

"Q  You folks arbitrarily decided that your old evaluations for all structures in the Territory was lagging behind?

"A  Yes. These 1938 cost factors that were used were too low, and Mr. Fuller got together with a lot of these contractors and worked out a figure of 676 for 1952 on this re-evaluation for the whole Territory."

"Q  How about 1951, before that?

"A  1951 was only 20% over the 1938 replacement.
*  *  *  *  *

"A  Just a policy of the office. We figured the 1938 cost factors were too low, in 1950 and 1951, and they

increased all buildings by 20%. Then in 1952 when the whole Territory was revalued, they increased it to 676."

Asked what was the value in 1949 of the main building, the witness responded that it was $7,884. It was such an old building that they had $7,884 all the way down to now. It was the feeling of the tax office that this building had not increased in value between 1947 and 1949.

Referred to the second building, the witness Souza testified that the outside portion was assessed at $660 and the building number two was assessed at $1,869 in 1947; that was so in 1949 and the garage was $30, making a total value of $10,443 for 1949.

In 1947 the second building was assessed at $2,118 and less in 1949, because of depreciation for two years, bringing it down to $1,869.

Upon redirect examination, the witness, Souza, testified that his records did not show any amount of money was spent on the property in 1947 or 1948 or 1949, but if unknown to him there had been expenditures made, that could have affected the valuation. "There was no permit taken out for those years. They may have done some work there without a permit." * * * "The only way we can get a correct figure on these improvements when they don't take out a permit is to do a lot of field work, and we don't have the manpower." They do not normally overly concern themselves with exempt properties.

"Q If I were to show you that a stone wall had been built around the premises, or a masonry wall, would that tend to affect your value?

"A No, stone walls and fences are not assessed.

"Q Now if I were to show you that an entirely new roof had been put on one of those buildings, would that affect your value?

"A Yes, we will go out and revalue the buildings.

"Q And if I were to show you that extensive remodeling, such as removal of partitions and creation of different sized rooms had been made, would that affect your valuation?

"A Yes."

Upon recross-examination, witness Souza said, in response to questioning, that according to law the City should take out building permits when materially changing buildings and if a contract was let out to a private individual the builder would be required to make a report, but the only reports received, by the tax office, were in 1938 and 1940, with respect to the property involved in this litigation. When he does evaluate churches and eleemosynary property, the same standards are used as in other cases, 60% of cost. As to the property under consideration, in this litigation, there is a record of actually sending a man, a Mr. Ward, out there on September 16, 1938, and September 28, 1938, and July 11, 1940. The original survey "was made by Moses on November 15, 1929. That is when these drawings were made, and since then they have no other drawings." Has no record of a man going up there since. His office does not use the terminology "capital improvement," but does use the word "improvement," and the latter includes buildings on property, not walls, but foundations and partitions and substantial repairs to a roof are included. Asphalt floors in buildings and floor coverings are taxable and assessed; likewise new electric wiring replacement and new lights, like fluorescent lights. "That is assessed, all taken care of in the cost factor."

Minor repairs would be considered a repair job and not an improvement. "We don't put any new assessments for paint jobs or a blacktop driveway."

After the conclusion of the testimony of the witness Souza, by stipulation in open court the respondents be-

low, appellees here, admitted the allegations of paragraph IX of the petition to the effect that no public auction was ever held prior to the conveyance of the property in question to Izumo Taisha Kyo Mission of Hawaii; that as to paragraph X of the petition, it was conceded that the answer of the City admitted the document in question was executed against the advice of the acting city and county attorney of Honolulu; that as to subparagraph (b) the answer is very specific and admits that the city and county attorney refused to represent the board of public parks and recreation independently of the City; and as to subparagraph (b) and (c) of paragraph X of the petition, counsel for the respondents said they considered those paragraphs subject to being stricken by motion, but did not make the motion "for the reason that they are surplusage."

The petitioner, appellant herein, then rested, whereupon counsel for the Mission moved to have the petition dismissed, "first, because there has been a complete failure of proof of the Petition." Such motion was made orally, in open court, and counsel for the other respondents, appellees, joined therein and in argument thereon.

At the conclusion of oral argument, the trial court — according to the clerk's minutes — "stated that the Petitioner would have up to and including December 15th to file the opening memoranda and the Respondents to have up to and including December 20th to reply."

On the 20th day of January, 1955, the circuit judge who presided at the trial entered and filed his decision and thereby granted the motion to dismiss the petition.

Pursuant to the said decision a "FINAL DECREE" was entered and filed in the circuit court on the 17th of May, 1955. It is from that decree that the appellant (petitioner below) has prosecuted his appeal.

The appellant, in his opening brief, has in the speci-

fication of errors relied on alleged that the circuit court erred because of:

"1. Its failure to hold as a matter of law that public lands of the City and County may be sold only at public auction;

"2. Its failure to find that the Grantee of the deed did not qualify under Section 6521 (35A) R.L.H. 1945; and

"3. Its failure to find that the discrepancy between market value of the property conveyed and the consideration paid therefor amounted to a constructive fraud on the Appellant and the class he represents."

The appeal has brought before this Supreme Court the whole record of proceedings in the circuit court, including, *inter alia,* the pleadings. A reason why the substance of the petition and of the answers thereto have been herein set forth at greater length than usually.

The appellant's first specification of error presents the question as to whether public lands of the City may legally be sold only at public auction.

Appellant contends that the municipality of the City and County of Honolulu was created by the provisions of Chapter 127, R. L. H. 1945, as amended (now Chapter 149, R. L. H. 1955), and that section 6521, R. L. H. 1945 (now 149-86, R. L. H. 1955) defines the powers delegated to the municipality by the Territory and that one of these powers is to sell public lands as outlined by section 6521 (33), R. L. H. 1945 (now 149-86 [34], R. L. H. 1955). At the time of the deed in question herein, from the City to the Mission, section 6521 (33), R. L. H. 1945, read as follows:

"Section 6521 (33). Sale of real property. To sell at public auction, after notice by publication once a week for at least two weeks in any daily newspaper of general circulation in the city and county, any real

property acquired by the city and county whenever the board deems it advisable to abandon the use of such property for the purpose for which it was acquired; provided, however, that the proposed sale of any abandoned school site shall first be approved by the superintendent of public instruction, and that the proceeds from such sale shall be used only for acquiring land or for the erection of buildings for school purposes, and that the proposed sale of any park property or water works property subject to chapter 132 shall be subject to the provisions of sections 6769 or 6848 as the case may be; provided, further, that no such real property bordering on the ocean shall be sold or otherwise disposed of; provided, further, that all real property acquired by the city and county by purchase at any sale for default in the payment of any improvement district assessment may by the treasurer be sold at either public or private sale; the minimum price at which each lot shall be so sold shall be determined and fixed by a committee consisting of the mayor as chairman, and the treasurer, auditor and chairman of the finance committee of the board of supervisors, of the city and county; such prices and notice that such lots are held for sale shall be published at least once in a daily newspaper of general circulation in the city and county before sale, and, in the event of a sale at public auction, the prices so determined shall constitute the upset price for the respective lots so auctioned."

The above quoted section confers upon the board of supervisors of the City the general power to sell public lands at public auction, after proper notice to the public, whenever the board deems it advisable to abandon the use of such property for the purpose for which it was acquired; provided, however, "that the proposed sale of any * * * park property * * * shall be subject to the pro-

visions of sections 6769 * * *."

Section 6769, R. L. H. 1945, was amended by Act 237, S. L. H. 1945.

Prior to its said amendment, section 6769, R. L. H. 1945, read as first hereinafter quoted:

"Purchases and sale of park property; contracts. The board of supervisors shall not purchase any real property for park purposes, nor sell, exchange or otherwise dispose of any park property, whether real or personal, without the prior written approval of the park board. All proceeds of any such sale shall be deposited with the treasurer and all such proceeds from the sale of real property shall be expended only for the acquisition of other real property for park purposes, and all such proceeds from the sale of personal property shall be expended only for the acquisition of other personal property for park purposes.

"The park board shall have power to contract for work, and to purchase supplies, materials or equipment, the cost of all of which shall be met from the funds it may have on hand either by appropriation from the board of supervisors or otherwise. All contracts shall be executed in the name of the board and shall be signed by the chairman or acting chairman. The park board shall also have authority to contract for the importation of or to import for the purpose of keeping and to keep in captivity foreign birds for educational and scientific purposes, subject to the rules and regulations of the board of agriculture and forestry relative to the importation and keeping in captivity of such birds."

Subsequent to its amendment by Act 237, S. L. H. 1945, section 6769, R. L. H. 1945, read as next hereinafter quoted:

"Sec. 6769. Purchases and sale of public parks and

recreational property; contracts. The board of supervisors is empowered and authorized to purchase, sell, exchange or otherwise dispose of park or recreational property, whether real or personal, with the prior written approval of the board of public parks and recreation, provided, however, that the board of supervisors may purchase, sell, exchange or otherwise dispose of park or recreational property in the absence of such approval, by the affirmative vote of at least five of its members. All proceeds of any such sale shall be deposited with the city and county treasurer and all such proceeds from the sale of real property shall be expended only for the acquisition of other real property for park and recreational purposes, and all such proceeds from the sale of such personal property shall be expended only for the acquisition of other personal property for park or recreational purposes.

"The board of public parks and recreation shall have power to contract for work and to purchase supplies, materials and equipment, the cost of all of which shall be paid from funds it may have on hand either by appropriation from the board of supervisors or otherwise.

"All contracts shall be executed in the name of the board of public parks and recreation and shall be signed by the chairman or acting chairman. The board of public parks and recreation shall also have authority to contract for the importation of or to import for the purpose of keeping and to keep in captivity foreign birds for education and scientific purposes, subject to the rules and regulations of the board of agriculture and forestry relative to the importation and keeping in captivity of such birds."

Before the amendment of said section 6769, R. L. H. 1945, it prohibited the board of supervisors from selling,

exchanging, or otherwise disposing of park lands, unless they had received the prior written approval of the board of public parks and recreation. After the amendment by Act 237, S. L. H. 1945, it was no longer imperative that the board of supervisors obtain the consent of the parks board to dispose of park or recreational property, for such land could be disposed of "in the absence of such approval, by the affirmative vote of at least five of its members [members of the board of supervisors]."

An issue between the appellant and the appellees has been as to the effect of the amendment of section 6769, R. L. H. 1945, by Act 237, S. L. H. 1945. The appellant's contention is that prior to the amendment the board of supervisors were absolutely prohibited from disposing of any park land unless they had received the prior written approval of the board of public parks and recreation, and the effect of the amendment was to empower the board of supervisors to dispose of park or recreational property, "in the absence of such approval, by the affirmative vote of at least five of its members." Further, that even after the amendment, there is no waiving of the requirement that a public auction be held, for that is one of the requirements of section 6521 (33), R. L. H. 1945, as to the sale of real property and, whether before or after amendment, the provisions of section 6769, R. L. H. 1945, have always been a limitation, rather than an enlargement, of the general power of sale invested in or delegated to the City by the provisions contained in section 6521 (33), R. L. H. 1945 (now 149-86 [34], R. L. H. 1955).

Contra to that of the appellant, the appellees' contention is that said section 6521 (33) is not applicable here, but that, if considered applicable, it does not make it mandatory for the City to alienate public lands by public auction only. Also, that section 6769, as amended by said Act 237, empowers the board of supervisors to alienate

lands without the prior written approval of the board of public parks and recreation, when, by an affirmative vote of at least five of its members, it so agrees to sell, or otherwise dispose of public lands within the control and management of the board of public parks and recreation. Further, "that section 6521 (33) does not impose a limitation upon the City to alienate public land only by public auction and that section 6769, as amended, does not require the disposition of public land by public auction only."

It is axiomatic that a municipal corporation has only such powers as are delegated to it by the legislature. Likewise the powers and duties of the board of supervisors of the City can be no greater than those delegated to them by the legislature, and their powers and duties at the time of the execution of the deed involved herein were as specified in section 6521, R. L. H. 1945, as amended, subparagraph "33" of which related to the sale of real property and defined their power with respect thereto: "To sell at public auction, after notice by publication once a week for at least two weeks in any daily newspaper of general circulation in the city and county * * *" with, *inter alia,* the proviso, "that the proposed sale of any park property * * * shall be subject to the provisions of sections 6769 * * *" all of which included both a power of sale and a restriction on that power. In such respect this court agrees with the contention of the appellant and disagrees with the contention of the appellees.

The enactment by the legislature of Act 237, S. L. H. 1945, insofar as it amended section 6769, R. L. H. 1945, to empower the board of supervisors to dispose of park or recreational property in the absence of approval by the parks board, by an affirmative vote of at least five members of the board of supervisors, did not and could not, however, alter the provisions of section 6521 (33), of

Chapter 127, R. L. H. 1945, limiting the power of the board of supervisors in respect to the sale of real property, to sell at public auction, for as enacted said Act 237 had the title as follows: "An Act Relating to Public Parks, Recreation and Playgrounds, Amending Chapter 130 of the Revised Laws of Hawaii 1945, and Repealing All Laws, Ordinances, Rules and Regulations in Conflict with this Act." (See Act 237, S. L. H. 1945, Regular Session.) The title of the act, *supra,* refers only to Chapter 130, R. L. H. 1945, and, therefore, can relate only to laws, ordinances, rules and regulations embraced within the chapter and in conflict with the act, for, section 45 of the Hawaiian Organic Act provides: "That each law shall embrace but one subject, which shall be expressed in its title."

Therefore, this court holds that the amendment of section 6769, R. L. H. 1945, by Act 237, S. L. H. 1945, did not empower the board of supervisors of the City to sell real property otherwise than by public auction, but merely relieved the board of supervisors of the necessity of obtaining the approval of the parks board to a sale in the event the supervisors themselves approved of a sale by the affirmative vote of at least five of their membership.

Appellant's second specification of error is to the effect that the circuit court erred in failure to hold that the grantee of the deed involved herein could not qualify under the provisions of section 6521 (35A), R. L. H. 1945.

Section 6521, R. L. H. 1945, was amended by Act 97, S. L. H. 1945, by adding a new subsection thereto, as follows:

### "ACT 97

"An Act Granting to the Board of Supervisors of the City and County of Honolulu the Authority to Reconvey Real Property Acquired by the City and County by Gift or for Nominal Consideration Where the Purpose for Which Such Property was Taken has been Abandoned.

"Be it Enacted by the Legislature of the Territory of Hawaii:

"Section 1. Section 6521 of the Revised Laws of Hawaii 1945 is hereby amended by adding thereto a new subsection which shall be appropriately numbered and shall read as follows:

"[35A. Reconveyance of gift property, when?]

" 'Subject to the limitations hereinafter contained, to reconvey to the donors, their heirs or assigns, within ten years from the date of the acquisition thereof, without requiring compensation therefor, any real property or portion thereof, acquired by the city and county by way of gift or for nominal consideration whenever the board deems it advisable to abandon the use of such property or said portion thereof for the purpose for which it was acquired, any other applicable provision of the law to the contrary notwithstanding. Where the return of such property would have the effect of cutting off an abutting owner's street frontage such property shall be first offered to such owner as provided in Section 6101 of the Revised Laws of Hawaii 1945.' "

In the answering brief for all of the appellees herein, argument has been made that the petition in equity number 5870 — the record of which has been brought up to this court by the appeal herein — "does not properly allege the nonapplication of this section [last above quoted] and the absence of any proof in that regard at the hearing, plus the absence of a proper prayer for relief on that point, cannot be remedied upon review by this court." In the same brief, it is further argued that:

"There can be no dispute that the City and County of Honolulu owned the property involved in the sense that it held the naked title thereto at the time it re-

conveyed the same to the Appellee, the Mission. The only allegation in the petition with respect to the Mission's entity is that:

> " 'The Respondent, Izumo Taisha Kyo Mission of Hawaii is an Hawaiian eleemosynary corporation incorporated under the laws of the Territory of Hawaii on July 2, 1952 . . .'
>
> "(first part of paragraph II on page 1 of the petition)

"The petition does not allege that the respondent, Mission, is not the same donor that originally conveyed the property to the City, nor was there any evidence presented to prove that the Mission here is not the same donor that originally conveyed the property to the City nor is there any allegation in the petition or proof offered at the trial to establish that the reconveyance to the Mission is not the same Mission that originally conveyed the property as a gift to the City. Therefore, any argument regarding the legal entity of the Mission was not properly before the Circuit Court or before this court.

"Notwithstanding the inadequate allegations of the petition on the application of section 35A, a strong indication that it was a reconveyance of gift property is the obvious fact that the alleged consideration in the deed of reconveyance from the City to the Mission is in the exact amount alleged as consideration in the original grant from the Mission to the City — and that fact alone negates any possibility of establishing a constructive fraud on the basis of inadequacy of consideration. That point, however, will be argued later.

"Only by inference does the Appellant attempt to argue that the Mission is not the same Mission that originally conveyed the property to the City, by relying

upon the single allegation in paragraph II of the petition, as aforesaid.

"The only evidence offered was a copy of the petition for the charter of incorporation filed in the office of the Treasurer of the Territory of Hawaii on June 23, 1952, and a copy of the charter granted on July 2, 1952, as mentioned on page 3 of the transcript of evidence. *The Appellant offered nothing more!*

"Appellant appears to have relied upon the respondent Mission to assume the burden of proof to show that the Mission was a reincorporation of the original eleemosynary corporation, and apparently on this false assumption failed and neglected to submit any evidence whatsoever to the Circuit Court as to the identity of the Appellee Mission.

"In the absence of any evidence to the contrary, this court has a right to conclude that the parties proceeded in the manner alleged and as substantiated by their acts and deeds."

Such an argument reflects an utter disregard by the appellees of the pleadings and proceedings in the court below. In the Mission's answer to the petition, the substance of which has been given *supra,* the Mission controverted the allegation in the statement of paragraph II of the petition that it was incorporated under the laws of the Territory of Hawaii on July 2, 1952, and stated: "* * * the act of July 2, 1952, was a re-incorporation of the Izumo Taisha Kyo Mission of Hawaii." Therefore, when the petitioner placed in evidence a petition for the charter of incorporation filed in the office of the treasurer of the Territory of Hawaii on June 23, 1952, and the copy of the charter granted on July 2, 1952, the petitioner thereby made a prima facie showing that the incorporation thus effected was subsequent to the year 1949, when the land involved in the proceedings was under the control

and management of the board of public parks and recreation and, therefore, the corporation to which the charter was granted on July 2, 1952, could not have been the donor of the said land to the City. Such prima facie showing made it incumbent upon the Mission to rebut the same, if it could, by a showing that the said incorporation was what the Mission claimed it to be, a "re-incorporation." However, the record is devoid of any proof whatsoever on the part of the Mission that the said incorporation was in fact and in law a "re-incorporation," or that it had in a prior corporate capacity once held legal title to, or any equitable interest in, the land in question.

Further, in connection with the appellant's petition for summary judgment in the court below, he, as petitioner, presented therewith, *inter alia,* the certificate of Kam Tai Lee, then treasurer of the Territory of Hawaii, to the effect that prior to November 27, 1944, there existed a Hawaiian corporation named "Izumo Taisha Kyo Mission of Hawaii"; that pursuant to a petition for voluntary dissolution of said corporation and proceedings had in accordance with law, the said Izumo Taisha Kyo Mission of Hawaii, by decree of the treasurer of the Territory of Hawaii, on July 11, 1945, was dissolved and disincorporated; that on said July 11, 1945, H. Sadayasu, K. Minami, S. Kuroda, D. Kawamura, and U. Yamane were appointed by the treasurer of the Territory of Hawaii as trustees in dissolution of said corporation, and that on July 12, 1946, said trustees did file their final accounts in the office of the treasurer of the Territory of Hawaii. That from July 11, 1945, to July 2, 1952, no corporation named Izumo Taisha Kyo Mission of Hawaii existed under the laws of the Territory of Hawaii, according to said records and files in the office of the treasurer of the Territory of Hawaii. That on June 23, 1952, there was filed in the office of the treasurer of the Territory of Hawaii, a petition for

a charter of incorporation of a proposed eleemosynary corporation named "Izumo Taishakyo Mission of Hawaii"; that said petition in no manner or way make reference to any previously existing or then existing corporation, and does not purport to be a petition for a reincorporation of or amendment to the charter of any then existing or previously existing corporation; and that on July 2, 1952, a charter was granted to the "Izumo Taishakyo Mission of Hawaii."

There has been no showing in the record of the court below and none in this Supreme Court that there is any statute of the Territory of Hawaii pertinent to incorporation of any organization or association, or pertinent to corporations, which authorizes or provides for "re-incorporation" of a corporation that has once been dissolved and disincorporated.

Upon examination of the copy of the petition for charter of incorporation filed in the office of the treasurer of the Territory of Hawaii on June 23, 1952, and the copy of the charter granted, pursuant thereto, on July 23, 1952 — which copies were together offered, received in evidence and marked "Petitioner's Exhibit 1" in the circuit court — this court finds that there is nothing therein contained or expressed to indicate that "re-incorporation" was either sought by the petition or effected by the charter. In fact, paragraph "I" of the petition commences with this language:

"That they [petitioners] wish to form with others an organization to be known as the IZUMO TAISHA-KYO MISSION OF HAWAII, with all the rights, privileges, powers and immunities which are now or hereafter may be secured by law to corporations organized for educational, fraternal, eleemosynary or religious purposes, * * *."

In 13 Am. Jur., *Corporations*, § 1342, p. 1191, it is stated that:

"Apart from statutes extending the existence of, or conferring powers upon, corporations for the purpose of winding up their affairs, the dissolution of a corporation implies the termination of its existence and its utter extinction and obliteration as an entity or body in favor of which obligations exist or accrue or upon which liabilities may be imposed."

In *Allen* v. *North Des Moines Methodist Episcopal Church, et al.*, 127 Iowa 96, 102 N. W. 808 (1905), it was held that the dissolution of the old church and organization of the new was a bona fide formation of a new corporation and the court, in its opinion stated:

"It is true we have said the new church is principally made up from the membership of the old; that it is affiliated with the same conference, acknowledges the same ecclesiastical authority, professes the same faith, occupies the same locality, and pursues the same general policy; but these do not constitute corporate identity."

Likewise, in *Bellow* v. *Hallowell and Augusta Bank*, 2 Mason (U. S.) 31 (1819), Fed. Case No. 1279, it was held that the similarity of corporate name, members, officers, and objects or purpose per se does not render two corporations one.

At page 43, Justice Storey stated:

"The first ground rests on the suggestion that the old bank and the new bank are the same corporation, the new charter being but a re-incorporation or rather a continuation of the charter of the old bank, which would otherwise have expired by its own limitation. If the premises were well founded, the conclusion would certainly follow, that the new bank is liable for the debts of the old bank. But we are called upon to admit these premises, not upon the plain and positive

enactments of the statute incorporating the new bank but upon the collateral facts, that the names of both corporations are the same, the officers are the same, and a majority of the stockholders are the same; and that the business of the old bank was for a time done, and its debts paid, by the new bank. It is certainly true that a corporation may retain its personal identity, although its members are perpetually changing, for it is its artificial character, powers and franchises, and not the natural character, of its members, which constitute that identity. And for the same reason corporations may be different, although the names, the officers, and the members of each are the same. An insurance Co. composed of the same natural persons and officers, and with the same name as an incorporated bank, would still be a different corporation from the bank. The similarity of name, of officers, or members, or even objects, cannot then per se establish the identity of corporations created at different times, by different charters, and having a distinct independent being. And one corporation may transact the business and pay the debts of another corporation without thereby merging in the latter its distinct corporate existence. There is indeed a repugnancy in the statement of the proposition that two corporations are in point of law the same, for it would at the same time establish that there is but one corporation.

"To ascertain whether a charter create a new corporation or merely continue the existence of an old one, we must look to its terms and give them a construction consistent with the legislative intent and the intent of the corporators."

In the answering brief for all of the appellees, this quotation is given: "A corporation may reincorporate in the same state without becoming a new corporation."

The citation for that is given as "(14-A.C.J. 3600)"; however, the quoted sentence is but a sentence extracted from section 3600 of 14a C. J., p. 1037. The section commences and to the sentence quoted in appellees' brief reads as follows:

"A corporation can reincorporate only where it is authorized to do so by a special or general statute. Such authority is sometimes conferred by general laws. Authority to sell, lease, exchange and dispose of the property of a corporation does not authorize reincorporation. By statute the corporation may as matter of right reincorporate under the same name, and may enforce the right by a writ of mandamus; or it may take a different name." [Then follows the sentence quoted by the appellees and thereafter the paragraph continues as hereinafter quoted.] "Reincorporation in another state creates a new corporation. The determination of the question whether the reincorporation results in a new corporation or a continuance of the old, is frequently held or said to depend upon the intention of the legislature and of the incorporators. * * *."

Section 3601, which follows is as hereinafter quoted:

*"Under some statutes* a dormant or defunct corporation may be reincorporated." (Emphasis added.)

The cases of *Broughton* v. *Pensacola,* 23 L. ed. 891, *Polk* v. *Mutual Reserve Fund Life Association,* 137 F. 273, *Strahm* v. *Frazier,* 32 Cal. App. 447, and *Jones* v. *Francis,* 70 Wash. 676, 127 Pac. 307, have been cited by the appellees as allegedly supporting the statement made in the single sentence quoted by them from section 3600, C. J. 14a, p. 1037.

The first of such cited cases, *Broughton* v. *City of Pensacola,* is not applicable in the instant case as that involved a legislative act rechartering the City of Pen-

sacola, which vested its powers in the mayor and board of aldermen, at all times to continue "to act in their respective functions" until the election and qualification of their successors in office. The court said:

> "It is sufficient that here, in our judgment, there was a continuation of the Corporation of Pensacola, with its original rights, of property and obligations, in a new and distinct creation of corporate capacity and liability."

The second case, that of *Polk* v. *Mutual Reserve Fund Life Association,* is not applicable herein, as it involved a reincorporation of an insurance association in conformity with "New York Insurance Law."

The third case, that of *Strahm* v. *Frazier,* is not applicable herein because the evidence therein showed that the old corporation Vaughn & Frazier forfeited its charter for non-payment of license tax and transferred all its property to defendant corporation Frazier Studios, which was apparently but a mere continuation and reorganization of the old corporation of Vaughn & Frazier and the court held: "Under these circumstances and the authorities cited, plaintiff, [a creditor of the original corporation] we think, was entitled to have the new corporation respond to his demand."

The fourth case, that of *Jones* v. *Francis,* is not applicable herein because it involved a claim against one corporation and the question of liability of a new corporation which "took over the assets of the old one, without any consideration other than to issue its capital stock to the stockholders of the latter in the ratio of their former holdings. The objects, assets, and the stockholders of the new corporation are identical. It was not a sale but an absorption of the assets of the old corporation."

In his third specification the appellant has alleged error on the part of the trial court in its failure to find

that discrepancy between market value of the property conveyed and the consideration paid therefor amounted to a constructive fraud on the appellant and the class he represents.

The testimony of the witness Ernest Souza, as summarized *supra,* was to the effect that the land and improvements together (constituting the property involved in this suit) in 1952 had a total market value of $46,077.00. There was no evidence in contradiction of that valuation.

The deed in question (Petitioner's Exhibit 2) contains the unequivocal statement that, "in consideration of TWO THOUSAND FOUR HUNDRED SEVENTY-EIGHT AND 55/100 DOLLARS ($2,478.55) received from the said Grantee, the said Grantor does hereby grant, bargain, sell and convey unto the said Grantee * * *."

Therefore the reception in evidence of petitioner's exhibit 2 constituted a prima facie showing that the consideration for the conveyance was that specified in the deed itself and placed the burden of proof upon the appellees to show, if they could, that the consideration for the conveyance was in fact other than that specified in the deed. However, the trial judge ignored the presumption arising from the statement of consideration therefor in the deed and also the burden of proof assumed by the Mission when in its answer to paragraph VIII of the petition it alleged an affirmative defense to the effect that the sum named in the deed as the consideration therefor "was not in any manner consideration for the reconveyance of the land in question and pleads *that the title to the said land was wrongfully and illegally acquired by the respondent City and County of Honolulu through a mistake of law and of fact * * *,"* (Emphasis added.) and in the same answer stated "as a part of its affirmative defense":

(1) That the original conveyance to the City was an illegal transfer;

(2) That it relied upon Section 6769, R. L. H. 1945, as amended by Act 237, S. L. H. 1945, and also on Act 97, S. L. H. 1945, amending Section 6521, R. L. H. 1945, as amended by adding a new subsection 35-A;

(3) That Section 6521 (33), R. L. H. 1945, has been amended by Act 97, S. L. H. 1945, "and therefore, the allegations and conclusions pleaded in Paragraph IX, subparagraph (a), [of the petition] are incompletely pleaded and [the subparagraph] is inapplicable, and"

(4) That all the provisions of laws cited as Act 237, S. L. H. 1945, and Act 97, S. L. H. 1945, "were fully and completely complied with by the Honorable Mayor and the Board of Supervisors, and hence, such transfer of land was not ultra vires nor contrary to law."

That in its answer the Mission assumed the burden of proof of an affirmative defense appears more fully in the substance of the Mission's answer as hereinbefore set forth.

In his written decision, dated the 20th day of January, 1955, the trial judge said:

"Only two witnesses were called by the Petitioner, who was not present during the proceedings at any time. The first witness was J. Edward Lyons, Superintendent of the Parks Board, who testified that some $17,000.00 was expended by the Board as and for what he termed to be capital improvements. He further testified that the Board had under its control and management approximately 24,000 acres of park and recreational lands and that the area of Leleo Center was about one-third of an acre.

"The other witness, Ernest Souza, Tax Assessor of the Territory of Hawaii, testified that the greater proportion of the work done at Leleo Center by the Parks Board was not considered by his department to be capital improvements.

"The Court visited the premises and made a detailed study of the improvements and the general condition of the premises.

"No further evidence was presented although the parties stipulated to certain allegations as being true. These stipulations are not material to the ruling of this Court on the motion presented by the Respondents.

"The Court finds from the evidence adduced and upon inspection of the premises that the allegation with respect to the expenditure of $22,000.00 for capital improvements is not sustained. Not only does Mr. Souza's testimony refute this in large measure but the Court, in observing the premises, found that a substantial portion of the improvements was in the renovation of the premises designed primarily for the purposes of the Parks Board and in repairs and costs for building moveable cabinets. The amount spent for these items hardly enhanced the value of the premises.

"The Court further finds that the Leleo Center is not an integral part of the city's park and recreational system and does not fill an urgent need in the community. The athletic facilities leave much to be desired and the quarters for other recreational facilities are cramped, not in accordance with the usually fine recreational facilities offered elsewhere in the city by the Parks Board and the location highly inaccessible. The buildings are old and shabby in appearance and there seems to be an immediate need for much needed repairs. That the personnel of the Parks Board was successful in carrying out their program is a personal tribute to the staff rather than the facilities or its location. The staff would have done equally as well in any location.

"The Court further finds that the admissions by the City and County of Honolulu that the sum of

$2478.55, designated as consideration in the deed of conveyance to the Respondent Mission, does not in itself establish as a matter of law that the conveyance was, in reality, a gift of public property. There is nothing in the evidence presented by the Petitioner to aid the court in reaching a conclusion that this was in fact a gift of public property and therefore constructive fraud. In fact the evidence is completely lacking to show that this sum of $2478.55 was the total consideration for the conveyance.

"Fraud, actual or constructive, is generally recognized as a principal ground for the cancellation of a deed but the mere allegation of fraud without supporting and clear evidence will not in itself render a transaction fraudulent. It is incumbent upon the Petitioner to show by clear and convincing proof that this transfer was indeed fraudulent. This he has completely failed to do.

"Inadequacy of consideration in the conveyance of land may be sufficiently gross to be clearly indicative of undue influence if there is an unconscionable advantage taken by one against the other. This court can reach no such conclusion from the evidence presented. In fact lengthy hearings were conducted by the Board of Supervisors which received wide publicity. All parties had an opportunity to be heard and it was only after much deliberation that the City and County officials transferred the land to the Respondent Mission. All this, of course, tends to refute any indication of fraud or undue influence.

"The Petitioner had a complete and adequate remedy at law. It could have taken action against the transfer at the conclusion of the hearings. It saw fit to file a petition in the land court. The judge there sustained a demurrer to that petition filed by the same Respondents herein.

"For the reasons set forth herein, the motion of the Respondents to dismiss the petition is granted and the petition is hereby ordered dismissed. An order will be signed upon presentation."

The final decree, which, pursuant to the said decision, was entered and filed in the circuit court on the 17th of May, 1955, by reference incorporated and made the decision a part thereof and is substantially repetitious of what was said in the decision.

It appears both from the said decision and final decree that the trial judge considered what he saw on his view of the *locus in quo* and to a great extent based his findings and decision upon his own observation, rather than on testimony heard and evidence received.

Inspection and view of the premises by the judge occurred on December 7, 1954, approximately 2½ years after execution of the deed in question from the City to the Mission.

There is no question as to the propriety of the judge in the instant case having, with the consent of the parties, made an inspection or observation of the *locus in quo,* but it has been generally held that a judge should not base his findings or decision on the result of his inspection or observation and that it should be limited to the purpose of enabling the court to properly understand and apply the evidence.

In *First National Bank* v. *Clifton Armory Co.,* 14 Ariz. 360, 128 Pac. 810 (1912), an action to enforce a chattel mortgage on a certain building, where the trial judge had a view of the premises in question and took into consideration in determining the issue as to whether or not the building was a real or a personal fixture, the court stated on appeal:

"Assuming that the court was empowered to have

a view of the premises in consequence of its ordinary common-law functions, and irrespective of statutory authority conferring the power, and that the propriety of inspection and view may not be impugned because it rested in the sound discretion of the court to clear up by the view some matter or thing involved in obscurity by the evidence in the case, and that such a view appeared to the court as necessary to a just decision in the case, *nevertheless, we are not prepared to hold that a res gestae or constituent fact may be determined by such view alone. That a presiding judge cannot give judgment on his personal and private knowledge is a doctrine as old as Chief Justice Gascoigne and has at all times been regarded as good law.*" (Emphasis added.)

In *McCammon* v. *Davis,* 162 Mich. 435, 127 N. W. 329 (1910), a suit for partition, the court held on appeal:

"If the contention of defendant Davis that the property will sell better in three parcels than in one is well founded, it certainly should have been easy for him to have produced evidence to that effect for the guidance of the court. * * * It may be that he relied upon the knowledge of the court as to the situation. *It is elementary that the court must base its decree upon testimony given in open court. Knowledge gained by a view of the premises might, with propriety, be used to determine which of the two methods of sale should be adopted, where both are supported by proofs, but such knowledge cannot alone be made the basis of a decree.*" (Emphasis added.)

In *Malalla Electric Co.* v. *Wheeler,* 79 Ore. 478, 154 Pac. 686 (1916), an action in ejectment, where there was conflicting testimony as to the value of the land in question, and the trial judge viewed the premises, and, from such inspection and a consideration of the testimony given,

made a decision, it was held on appeal that a judgment must be rendered in such case, not on the view had, but on the evidence introduced as explained by the view.

In *Claesgen* v. *Animal Rescue League of Hennepin County,* 173 Minn. 61, 216 N. W. 535 (1927), a case tried by the court without jury, it was held not error for the trial judge to visit the involved premises *only for the purpose that the testimony given may be better understood.* (Emphasis added.)

In *Atlantic Coast Line R. Co.* v. *Henry,* 112 Fla. 391, 150 So. 598 (1933), an action for damages, where the trial judge viewed the *locus in quo* and gave judgment predicated on facts acquired from the view, held on appeal:

"The judgment of the trial court was also apparently predicated on facts acquired from a view of the locus in quo as well as from facts brought at the trial. This was erroneous. A view of the locus in quo is for the purpose of explaining and clarifying evidence and facts brought out at the trial. It cannot be employed as a basis for judgment."

In *O'Connell* v. *California Ave. Bldg. Corp.,* 329 Ill. App. 327, 68 N. E. (2d) 543 (1946), a proceeding instituted by dissenting owners of shares in a corporation to determine the fair value thereof, where the principal asset of the corporation was a building which had been sold by defendant corporation, record disclosing that the trial judge disregarded all the testimony bearing on the value of the building and based his judgment solely upon his view of the premise, it was held on appeal to be in error.

In *Reitzel* v. *Cary,* 67 R. I. 418, 19 A. (2d) 760 (1941), action of trespass on the case for negligence, where the trial judge viewed the premises in question and facts ascertained by the view were made a basis for judgment rendered, held on appeal:

"The fact that he took a view cannot, however,

supply evidence of peculiar construction which is lacking in the record. Of course, the purpose of a view is not to supply evidence but only to aid in the understanding of it."

In *Weber Basin Water Conservancy Dist.* v. *Moore*, 2 Utah (2d) 254, 272 P. (2d) 176 (1954), a proceeding in eminent domain, where it was urged on appeal that if the testimony does not sustain the figure found, the view of the premises by the court can be treated in the nature of evidence and would justify the higher figure of value which no other evidence supported. The case was reversed and remanded for a new trial, the appellate court saying:

"Although courts are reticent in upsetting findings or verdicts after a view has been indulged, we do not believe the function of a view is to supply evidence totally lacking, but rather to assist in interpreting and resolving differences in evidence adduced under appropriate rules and procedure."

In *Jack* v. *Hunt*, 200 Ore. 263, 265 P. (2d) 251 (1954), an action to establish an easement, where the main contention raised was that the trial court made a view of the premises and had observed a certain factual situation, the appellate court said this:

"This view of the property by the trial court was not in itself evidence, but was only for the purpose of giving the court a better understanding of the evidence to be offered."

In the instant case, it appears quite clearly from the hereinbefore quoted decision of the lower court, which was incorporated in and by reference made a part of the decree, that the trial judge based the decision and decree upon his view of the premises, rather than on the evidence presented to the court and in doing so disregarded material evidence which was neither contradicted nor refuted by other evidence. Wherefore, the findings of fact made by

the trial judge and court must be set aside as clearly erroneous.

This court is of the opinion that the record amply shows constructive fraud which, *inter alia,* warrants the relief prayed for by the petitioner, appellant herein.

The Mission — as set forth in its answer to the petition and as appears in the record—has at all times claimed to be the same corporate entity which had previously conveyed to the City that property specified in the questioned deed of the 24th day of December, 1952, and that said questioned deed was actually a reconveyance by the original grantee (the City) to its original grantor. Likewise, the other respondents, appellees herein, acted upon the said claim and the assumption that the corporation to which the conveyance of the 24th day of December, 1952, was made was the identical legal entity which had previously conveyed the same property to the City. Thus the Mission was guilty of a legally false representation and the City and its officials in acting thereupon and upon a resulting erroneous assumption — and admittedly contra to the advice of the acting city and county attorney — disregarded their legal duty to act only in accordance with law and with regard for the interests of those persons of the class (taxpayers) represented by the petitioner and appellant herein.

"Constructive fraud is a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interest. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud." (37 C. J. S., *Constructive Fraud,* § 2, p. 211.)

The above-quoted text is supported by numerous cases cited in note 87, at page 211, and note 88, at page 212, 37 C. J. S.

"Fraud in its generic sense, especially as the word is used in courts of equity, comprises all acts, omissions and concealments involving a breach of legal or equitable duty and resulting in damage to another. Fraud has also been defined as any cunning or artifice used to cheat or deceive another. However, the wisdom of an exact legal definition of fraud has been questioned, and it has been stated that fraud is better left undefined, and some courts have said that the common law not only fails to define fraud but perhaps asserts as a principle that there shall be no definition. Further it is frequently stated that owing to the multiform character of fraud and the great variety of attendant circumstances no definition which is all inclusive can be framed, but each case must be determined on its particular facts." (26 C. J., § 1, p. 1059, as quoted in *Daly* v. *Showers* [Appellate Court of Indiana, En Banc., May 4, 1937] 104 Ind. App. 480, 8 N. E. [2d] 139, 142.)

Particularly pertinent to the instant case is what was said in the opinion of the appellate court in *Johnson* v. *Radio Station WOW,* 144 Neb. 406, 14 N. W. (2d) 666, 668, as follows:

"It is urged by the defendants that the issue of constructive fraud was not pleaded and that the holding of the court that the lease should be set aside because of constructive fraud constitutes a fatal variance from the pleadings. The petition meticulously recites the facts and prays for a decree declaring the lease to be illegal and void because of fraud and ordering cancellation and termination of the same, and for such other, further and different relief as equity and justice may require. * * * The character of a cause of action is determined by the allegations of fact contained in the petition, unaffected by the conclusions of the

pleader. An authoritative text states the rule as follows: 'Generally, however, it may be said, that the essential character of the cause of action and the remedy or relief it seeks, as shown by the allegations of a complaint, determine whether a particular action is at law or in equity, unaffected by the conclusions of the pleader or by what the pleader calls it, or the prayer for relief, or the nature of the defense interposed, or new matter stated in the reply, or whether the action is statutory or otherwise.' 1 C. J. S., *Actions*, § 54, p. 1152. The prayer of the petition asks for general equitable relief and is not, therefore, so restrictive as to preclude the holding that constructive fraud exists."

The questioned deed of the 24th day of December, 1952, is declared invalid, the decree appealed from is reversed and the cause is to be remanded to the circuit court with directions to by appropriate action nullify the effect of the purported conveyance made by the said deed, cause record title to the property therein described to be re-registered in the City and County of Honolulu, by reconveyance thereto, for the same consideration mentioned therein, or otherwise, and allow to petitioner, appellant herein, his costs and attorneys fees.

*Robert M. Rothwell* (also on the brief) for petitioner-appellant.

*O. Vincent Esposito & Nathaniel Felzer* (also on the brief with *Esposito & Esposito*) for respondent-appellee Izumo Taisha Kyo Mission of Hawaii, an incorporated association.

*Norman K. Chung,* City & County Attorney, and *John H. Peters,* Deputy City & County Attorney, for respondents-appellees, John H. Wilson, Leon K. Sterling, and The City and County of Honolulu, a municipal corporation. (*John H. Peters* was present but did not argue.)