See also, D.C., 51 F.R.D. 487.

**NORTHERN ACCEPTANCE TRUST 1065 By C. Jon HANDY, Trustee of the Northern Acceptance Trust 1065, and Dericksen M. Brinkerhoff, on behalf of themselves and on behalf of all other shareholders of the Lihue Plantation Co., Ltd., et al., Plaintiffs,**

**v.**

**AMFAC, INC., et al., Defendants.**

**Civ. No. 70–3107.**

United States District Court,
D. Hawaii.

March 19, 1973.

A. William Barlow, Honolulu, Hawaii, Mervyn L. Hecht, Roger Jon Diamond, Pacific Palisades, Cal., for plaintiff-appellant Northern Acceptance Trust 1065 by Roger Jon Diamond, co-trustee, and objector-appellant C. Jon Handy, individually and as trustee of PSP, Inc. Profit-Sharing Trust.

Asa M. Akinaka, Honolulu, Hawaii, Bruce W. Kauffman, David H. Pittinsky, Carl H. Hanzelik, Dilworth, Paxson, Kalish, Levy & Coleman, Philadelphia, Pa., Alexander Kahan, New York City, Kenneth P. Kimmel, Beverly Hills, Cal., for plaintiff-appellee Dericksen M.

Brinkerhoff and the members of the plaintiff classes.

Douglas E. Prior, Cades, Schutte, Fleming & Wright, Honolulu, Hawaii, A. Vernon Carnahan, Donovan, Leisure, Newton & Irvine, New York City, for defendant-appellee Amfac, Inc. and for the other defendants-appellees except Dean Witter & Co., Inc., Dean Witter & Co., Haskins & Sells, and Fireman's Fund.

Paul A. Lynch, Gerald Y. Sekiya, Bortz, Case, Stack, Kay, Cronin & Clause, Honolulu, Hawaii, for defendants-appellees Dean Witter & Co., Inc. and Dean Witter & Co.

Howard K. Hoddick, Anthony, Hoddick, Reinwald & O'Connor, Honolulu, Hawaii, Alfred I. Rothman, Loeb & Loeb, Los Angeles, Cal., for defendant-appellee Haskins & Sells.

James W. Rosenquist, Orrick, Herring, Rowley & Sutcliffe, San Francisco, Cal., for defendant-appellee Fireman's Fund.

## DECISION OF CHALLENGE TO THE VALIDITY OF EASTMAN DILLON'S APPRAISALS

PENCE, Chief Judge.

As appears hereafter, this latest suit challenges the validity of appraisals of stock value of Lihue Plantation Company, Ltd. (Lihue), Puna Sugar Co., Ltd. (Puna), and Kekaha Sugar Co., Ltd. (Kekaha) (collectively referred to as the "Plantations").

A review of the facts here relevant shows that in July 1968, defendant Dean Witter & Co. performed an appraisal which established a stock exchange share ratio [1] for a proposed merger of each of the Plantations into defendant Amfac, Inc.[2] Subsequently, the Boards

1. In its appraisal, Dean Witter valued Lihue stock at $66 per share, Puna stock at $25 per share, and Kekaha stock at $38 per share. Comparing these figures with the then (July 1968) market price of Amfac stock, Amfac management established an exchange ratio of 1.2 shares of Amfac common stock for each Lihue share, .50 share of Amfac common stock for each Puna share, and 1 share of 6¼% Amfac Convertible Preferred Stock for each Kekaha share.

2. Prior to the merger Amfac owned 85.63% of the outstanding shares of Lihue, 93.12% of Puna, and 61.60% of Kekaha.

of Directors of the Plantations and of Amfac approved the proposed mergers. The Boards of the Plantations called for special shareholder meetings, as are required to approve mergers, and in the process solicited proxies of the shareholders. At the meetings, an overwhelming percentage of the shares represented were cast in favor of the mergers,[3] and the mergers took effect in early January 1969.[4]

Shortly thereafter, plaintiffs Northern Acceptance Trust 1065 and Dericksen M. Brinkerhoff brought a class action suit in this court on behalf of all minority shareholders of the Plantations[5] and derivatively on behalf of the Plantations against, among others, Amfac and the Plantations as well as their officers and directors, and Dean Witter. Plaintiffs alleged that defendants had violated section 17(a) of the Securities Act of 1933, breach of common law fiduciary duties, and fraud. More particularly, defendants were alleged to have issued false and misleading proxy statements to the minority shareholders for the purpose of obtaining their approval of the mergers which operated to the detriment of the minority shareholders. Plaintiffs noted that the proxy statement failed to disclose, *inter alia*, the past relationship between Amfac and Dean Witter, which had performed the appraisal which established the exchange ratios for the merger, as well as the relationship between Ralph E. Phillips, Sr., a senior partner of Dean Witter, who was also an Amfac board member. As a result, plaintiffs alleged, Dean Witter did not perform its appraisal in an independent and impartial

manner, and caused the minority shareholders to receive less than fair value for their stock.

On May 5, 1971, Judge Tavares, of this court, granted plaintiffs' motion for summary judgment on the issue of liability under section 10(b) of the Securities and Exchange Act of 1934 against certain defendants, including Amfac and the Plantations. Subsequently, the parties entered into a Settlement Agreement which was submitted to and approved by Judge Tavares.

The terms of the agreement, here relevant, provided (1) for the impartial reappraisal of the stock of each of the Plantations at the time of the mergers, *i. e.*, January 1969. (2) To perform the reappraisal, an independent investment banking firm would be selected by the court and act under the court's "sole direction and supervision." (3) The court would further instruct the firm to "consider all relevant value criteria, including, but not limited to, market price, net asset value and investment value," and, in its consideration of net asset value, "to utilize, under [the firm's] direction, the services of an independent real estate appraiser." (4) To assure the independent judgment of the firm and of the real estate appraiser, both would be made officers of the court, and both would be paid by the court for their services.

Other terms of the agreement provided that the firm would have six months in which to file its report with the court, after which the parties could file written responses to the report with the firm. The firm could "adopt or re-

---

3. Voting results of the special shareholders meeting of October 31, 1968 (PX 40):

| | Shares Represented at Meeting | In Favor | Opposed |
|---|---|---|---|
| Lihue | 96.45% | 93.28% | 3.18% |
| Puna | 98.34% | 98.21% | .13% |
| Kekaha | 93.26% | 92.46% | .67% |

4. Mergers in Hawaii take effect upon filing with the Hawaii Department of Regulatory Agencies. Thus the Lihue and Puna mergers took effect on January 9, and Kekaha the next day.

5. Not every class member owned stock in all of the three Plantations.

ject [the comments] in whole or in part as it deems advisable."

At the hearing on the approval of the agreement the court said that, "Absent fraud or collusion, the appraisals prepared by the investment banker will be final, conclusive and binding on the parties, and no appeal or review will lie therefrom." Thereafter, on February 14, 1972, Judge Tavares appointed Eastman Dillon, Union Securities & Co. (Eastman Dillon) as the firm to perform the stock appraisals, and Gilbert W. Root (Root), a Hawaii resident, as the real estate appraiser to assist Eastman Dillon. Judge Tavares found that both were qualified and independent.

Soon thereafter, Judge Tavares issued his instructions to the appraisers, in conformance with the agreement.[6] In order to assure that the appraisers maintained their impartiality and independence, Judge Tavares imposed stringent requirements governing and surrounding the performance of the appraisals.[7]

Under the direction of Eastman Dillon, Root made his real estate appraisals and submitted his report to Eastman Dillon in early July 1972. Subsequently, on September 5, 1972, Eastman Dillon filed its report.[8] Eastman Dillon concluded that the value of Lihue stock as of January 1969 was $90.45 per share; of Puna stock, $31.61; and of Kekaha stock, $43.00. Eastman Dillon compared these values with the relevant market

6. The court's instructions to Eastman Dillon were:

It is the duty of Eastman Dillon, as the investment banker, to appraise the value of a share of capital stock of each of the three Plantations as of January 1, 1969 in the manner ordinarily, customarily and usually recognized in your profession for the purpose of determining exchange ratios in merger situations. You shall consider all relevant value criteria which shall include but not necessarily be limited to market price, net asset value and investment value. In the consideration of net asset value you shall utilize the services of Gilbert W. Root, M.A.I., of Honolulu, Hawaii as real estate appraiser who, under your supervision, shall appraise the value of such of the real estate of each of the three Plantations as directed by you. In the consideration of market price, you should discount or exclude quotations and sales reflecting the expectation of increased or decreased value as a result of the announcement on July 24, 1968 of the intention to merge the Plantations into Amfac, Inc.

The court's instructions to Root were:

Mr. Root, it is your duty, as the real estate appraiser, to appraise the value of such of the real estate of each of the three Plantations as directed by Eastman Dillon for Eastman Dillon's use in the consideration of net asset value. Although you are to perform your appraisals under the direction of Eastman Dillon, you are to reach your own independent judgment as to the value of the real estate appraised and you are to perform your appraisals in the ordinary, customary and usual manner recognized by your profession.

7. The court's supervision of the appraisers is as follows:

In conducting these appraisals, you shall serve as officers of this Court under this Court's sole direction and supervision. Your fees will be paid to you by this Court. Accordingly, it is essential that your performance be independent and impartial both in fact and in appearance. I therefore instruct all parties, their counsel and all other persons subject to this Court's jurisdiction not to initiate any contact or communication with either of you for any reason without prior approval of this Court. If any person attempts, directly or indirectly, to initiate any contact or communication with you with respect to any aspect of these appraisals without approval of this Court, you are instructed to advise this Court immediately of that fact, and appropriate action shall be taken. On the other hand, you are authorized to request relevant factual information from any party or counsel, who shall respond to such request without further order of this Court. Moreover, you are authorized to approach this Court with respect to any question which may arise.

8. Eastman Dillon subsequently filed a more comprehensive report which, by order of Judge Tavares, became the "original" report.

price of Amfac stock[9] which, when computed according to the exchange ratio, was the equivalent of $93.37 per share of Lihue stock, $38.91 per share of Puna stock, and $55.58 per share of Kekaha stock. Thus, the net effect of these figures demonstrated that the value of a share of any of the Plantations' stock did not exceed the value of the Amfac stock which shareholders of the several Plantations had theretofore received under the terms of the mergers and that the minority shareholders in fact benefited from the challenged exchange.

Subsequently, after Eastman Dillon filed its report, both plaintiffs and Amfac filed written comments with Eastman Dillon in accordance with the Settlement Agreement and the order of the court. After considering the comments, Eastman Dillon decided not to change its conclusions.

■ On August 18, 1972, Judge Tavares, having "expressly reserved jurisdiction . . . for the purpose of implementing, supervising and enforcing the terms of the settlement of which the appraisals are an integral and essential part",[10] scheduled a hearing on the question now before this court, i. e., whether the Eastman Dillon appraisals should be set aside as a result of fraud or other error. On November 6, 1972, plaintiffs also filed a motion to set aside the appraisals, alleging fraud and other irregularities. A two and one half day hearing was held before this judge[11] to consider these matters. Thereafter the parties filed post hearing memoranda.

*Findings of Fact and Conclusions of Law*

■ The court is satisfied that neither Eastman Dillon nor Root committed any fraud whatsoever in this case. Nor did plaintiffs proffer any evidence of actual fraud in the performance of their duties.

■ Plaintiffs also urge setting aside the appraisals on a constructive fraud theory, largely on the authority of a Hawaii taxpayer's case, Von Holt v. Izumo Taisha Kyo Mission, 42 Haw. 671, 721–723 (1958).[12] Plaintiffs in effect argue that certain appraisal techniques used as well as some not used by the appraisers resulted in what amounts to false appraisals, and thus constitute constructive fraud under the reasoning of *Von Holt*.

As more fully discussed hereafter, this court finds that the use or non-use of certain appraisal techniques or methods by Eastman Dillon and Root were matters of professional selection and judgment. Therefore, unless plaintiffs were able to show that false representations had been made, that certain techniques and methods were used or not used by the appraisers, would not, per se, constitute or result in constructive fraud. Neither in plaintiffs' memoranda nor at the hearings have they shown

---

9. Under the terms of the Settlement Agreement, the value of a share of Amfac stock would be determined by computing the average closing price of a share of the stock traded on the New York Stock Exchange during January 1969.

10. Here, judicial supervision is required even though the parties had agreed that the appraiser's conclusions would be final, conclusive and binding on the parties and not subject to review or appeal. The instructions issued by Judge Tavares, which assured the impartiality of the appraisal, did not supersede the court's supervisory power to determine whether there was fraud or error in the appraisal.

11. Judge Tavares was very ill in the latter part of 1972.

12. In *Von Holt*, the City and County of Honolulu had conveyed a certain real property to an eleemosynary corporation under a statute which enabled the City to reconvey donated property back to its donors. The Hawaii Supreme Court found that the corporation had falsely represented to the City that it (the corporation) was the same entity which had donated the property. On the basis of this false representation, the court found that constructive fraud was committed.

any such false representations on the part of either appraiser.

■ Plaintiffs' attack upon Eastman Dillon's appraisals on their theory that certain appraisal methods should or should not have been used, therefore can succeed only if plaintiffs have shown as a matter of law that the methods actually applied by the appraisers constituted such error as would require this court as a matter of law to set aside the appraisals. Obviously, if the court finds no such error, then it must permit the appraisals to take effect as agreed to by the parties.

Plaintiffs' primary allegation of such error is that the appraisers failed to perform their appraisals according to the instructions of Judge Tavares, asserting that a net asset value analysis was not performed as instructed. In particular, plaintiffs claim that Eastman Dillon's failure to instruct Root to conduct a separate real estate appraisal of the sugar-producing lands of the several Plantations, and Root's failure to perform such appraisal, resulted in an incomplete appraisal by Eastman Dillon of the value of plaintiffs' stock, thus constituting error. Similarly, plaintiffs allege that the value of certain corporate assets which are related to sugar production, *i. e.*, the growing crops, C & H stock, and Kauai Storage, should have

been separately valued and included in the net asset analysis performed by Eastman Dillon, and their omission thus also constituted error.

As set out fully in note 6, *supra,* Judge Tavares instructed Eastman Dillon to "consider all relevant value criteria which shall include but not necessarily be limited to market price, net asset value and investment value"; and Root was instructed "to appraise the value of such of the real estate of each of the three Plantations as directed by Eastman Dillon for Eastman Dillon's use in the consideration of net asset value." Both were further instructed to perform their appraisals "in the manner ordinarily, customarily and usually recognized" in their respective professions.

The evidence shows that in its appraisal of the value of the stock of each Plantation, Eastman Dillon first considered the use of the market price of the Plantations' stocks as one method of valuation. However, because the stocks were thinly traded,[13] Eastman Dillon found that this method was not particularly relevant.[14]

Similarly, to the extent that under the investment value approach, the value of a share of stock is *wholly* dependent on the capitalization of earnings, Eastman Dillon considered but did not apply that method.[15] As the record indicates, East-

13. The stock of each Plantation was traded on the Honolulu Stock Exchange. Between January 1966 and June 1968, only 2,890 shares of Lihue stock were traded out of 231,946 shares outstanding; 530 shares of Puna stock were traded out of 242,752 shares outstanding; and 1,675 shares of Kekaha stock were traded out of 200,000 shares outstanding. The small quantity of stock traded may, of course, be largely attributed to Amfac's majority ownership of the shares of each Plantation. *See* note 2, *supra.*

Given the limitations of thin markets, it may nevertheless be noted that Eastman Dillon's valuations exceeded the market price of the stock of the Plantations. In the five years preceding the merger, the highest price at which Lihue stock was trade was $62 per share, whereas East-

man Dillon's appraisal value was $88 per share; for Puna stock, the highest price was $21 compared with Eastman Dillon's $31 per share; and for Kekaha stock, the highest price was $32 per share, compared with Eastman Dillon's $43 per share.

14. Letter from Frederick Pape, General Partner, Eastman Dillon, to The Honorable C. Nils Tavares, United States District Judge, October 2, 1972, at 4–5 (hereinafter referred to as Eastman Dillon Appraisal Report).

15. The "investment value" method involves the application of a capitalization rate to the normal income of a company. By multiplying the income figure (usually the average annual income over a period of time, normally five years) by the capitali-

man Dillon reasoned that the sole use of the investment value method for the instant appraisals undervalued the fair value of the stock since underlying asset values, they felt, were not adequately reflected in earnings.[16] Thus, eventually Eastman Dillon used the net asset value method to make its valuations.

As instructed by the court, under Eastman Dillon's direction, Root performed his appraisal of the lands and improvements of the Plantations. With regard to the sugar-producing assets, including the sugar-producing lands and improvements, Root recommended to Eastman Dillon that these assets be valued on a going-concern basis. He had decided that the highest and best use of the sugar-producing assets was just that, *i. e.*, their present agricultural use, and he recommended that they be appraised accordingly. As investment bankers, Eastman Dillon was more properly qualified and experienced to select the appropriate capitalization rate and income figure. Eastman Dillon agreed with Root as to the use of the going-concern method, *i. e.*, taking the capitalization of earnings to determine the value of the sugar-producing assets. Therefore, in its analysis, Eastman Dillon applied the capitalization of earnings to the sugar-producing assets of the Plantations to determine the value of those assets.

Further, Root of course appraised the non-sugar producing lands, improvements and assets of the Plantations. The value of the non-sugar producing assets were then added to the value of the sugar-producing assets to determine the net asset value of the Plantations. This net asset value was then divided by the number of shares outstanding to determine the value of the shares of the Plantations.

Plaintiffs argue that this method of analysis and appraisal was error because Root did not "appraise", *i. e.*, fix a market price upon, the sugar-producing lands of the Plantations contrary, allegedly, to the instructions of Judge Tavares.

On its face, this argument appears not insignificant. As the record indicates, already high and continually rising real property prices are a fact of life in Hawaii. Anyone who is the least acquainted with present Hawaiian life would be impressed with the substantial rise in real property prices that have occurred within the past few years. Throughout the appraisal proceedings, plaintiffs set forth the probative force of these real property prices to the appraisers. This comprised the basic thrust of plaintiffs' objections to the appraisals.

One, however, can easily confuse the general rise in land prices with the more specific prices, and thus "values", of large parcels of land used for agricultural purposes on the Neighbor Islands.[17] The general rise in prices has usually

zation rate (determined by considering the industry's capitalization rate, the company's position in the industry, companies in like situations, and other factors considered relevant by an experienced investment banker), and then by dividing the result by the number of shares outstanding, the "investment value" figure is obtained. It should be noted here that although the capitalization of earnings may be used to determine the investment value of a company's shares, a similar capitalization of earnings may also be used in determining the value of specified assets. To distinguish the two, the latter method of capitalization of earnings is designated the "going concern" method of valuing *assets*.

The significant difference is that for the "going concern" method the capitalization of earnings is used to determine the value of those particular assets which produced the income. On the other hand, the investment value method is used to determine the value of a share of stock by looking to the total earnings of the company, not to the earnings of any particular assets.

16. Eastman Dillon Appraisal Report, *supra* note 14, at 4.

17. *I. e.*, the main islands in the state other than the island of Oahu, on which Honolulu is located. The Plantations are on the Neighbor Islands.

been associated with significantly smaller parcels of land used for tourist-related, residential, commercial and speculative purposes. In turn, this price rise has put pressures on large landholders to release agricultural land for non-agricultural purposes, but where such lands have been released, they have largely been gradual and with limited acreage. The reasons for the improbability of any large-scale release of agricultural lands either on an immediate or gradual basis were fully explored at the hearing.

The economies of the Neighbor Islands are founded upon the large agricultural plantations, primarily for employment and revenues. As this court takes judicial notice, both in the Kahuku (Oahu) and Kohala (Hawaii) plantation closings, the state and county governments exert pressure to prevent the closing of any viable plantation. The State Land Use Commission and the zoning authorities of each county determine land uses, which uses of course largely determine land prices. In fact, between August 1964 through September 1968, only 285 acres of prime agricultural lands were approved for redistricting out of agriculture, although petitions representing 2,647 acres of such lands had been filed for such a change.

Further, any threatened shutdown of a viable plantation would (and has in both the Kahuku and Kohala closings) certainly draw the pressure of the International Longshoremen's and Warehousemen's Union. Since it represents all agricultural workers in Hawaii, the union wields substantial political (as the elections have shown) power, particularly on all of the Neighbor Islands.

There are other practical considerations to any large-scale release of agricultural lands. The marketability of such large parcels would be in doubt. The image of high priced land on sugar plantation holdings is further tarnished and eroded when one realizes that the plantations have a somewhat limited amount of level oceanfront land, the ideal and most demanded type of real property for tourist-related or speculative purposes. Moreover, any potential purchaser would certainly have to take into account the high land development costs, which require a large cash outlay for streets, water, sewage, and the like (all of which are now demanded by the several counties when subdivisions, hotels, etc., are built).

The same reasons which apply to the improbability of any large-scale release of the lands of the Plantations apply as well to the necessitated slower liquidation which would follow sale. The Plantations would face substantial losses from the forced disposal of the then surplus sugar-producing improvements and equipment. The Plantations would also incur operational losses which would increase as cane acreage would be withdrawn. All this would substantially offset the proceeds obtained from the sale of substantial portions of the cane lands.

Prior decisions make it manifest that courts generally have deferred to the appraiser's expertise and have been inclined to support their determinations, absent any arbitrary or unreasonable findings.[18] Courts recognize that valua-

18. Jacques Coe & Co. v. Minneapolis-Moline Co., 31 Del.Ch. 368, 75 A.2d 244, 247 (1950); Flarsheim v. Twenty Five Thirty Two Broadway Corp., 432 S.W.2d 245, 259 (Mo. 1968); Warren v. Baltimore Transit Co., 220 Md. 478, 154 A.2d 796, 800 (1959); accord, Cummings v. United Artists Theatre Circuit, Inc., 237 Md. 1, 204 A.2d 795, 808 (1964); Knauff v. Utah Construction and Mining Co., 277 F.Supp. 564, 570, 579 (D.Wyo.1967), aff'd, 408 F.2d 958, 964–965 (10 Cir. 1969); also, Bache v. General Instrument Corp., 42 N.J. 44, 198 A.2d 759, 765 (1964); also, Jeffrey v. American Screw Co., 98 R.I. 286, 201 A.2d 146, 152 (1964); also, Note, Valuation of Dissenters' Stock Under Appraisal Statutes, 79 Harv.L.Rev. 1453, 1454 (1966) (hereinafter referred to as "Note on Valuation of Dissenters' Stock").

tions of stock contemplate economic, rather than legal questions and that these questions, often complex since they vary with each case, should best be left to qualified appraisers who are knowledgeable about corporate securities and finance.[19] Even in the hands of expert appraisers, valuation is often complex and difficult.[20] Thus, courts are not so much concerned with the end "value" figure as they are with the soundness of the procedures and reasoning upon which that figure was obtained.[21]

Here, this court is satisfied that Root did give "proper consideration to all relevant facts" and that he had sufficient and reasonable grounds for his determination that the highest and best use of the sugar-producing lands was in their present use. This court finds that Root's valuation of the sugar-producing lands on a going-concern basis rather than on a liquidation basis was not loose guesswork, nor was it arbitrary or unreasonable. It conformed with Judge Tavares' instruction. It was not error.

Plaintiffs, however, urge that even assuming that the going-concern valuation may have been justified on rational grounds, Root, either as an M.A.I. or under a direction by Eastman Dillon to do so, should have made a real estate appraisal of the sugar-producing lands since, plaintiffs argue, the legal definition of net asset value so requires.

To support that proposition, plaintiffs cite extensively from Poole v. N. V. Deli Maatschappij,[22] wherein the Delaware Supreme Court defined net asset value as a theoretical liquidation value.[23] The record indicates that counsel for both the plaintiffs and defendants, deliberately or otherwise, assumed that the Delaware definition is the only way "net asset value" can be considered, i. e., net asset value must be equated with liquidation value. As will appear hereafter, Delaware's constrictive definition is *not* the only way net asset value can be construed. Moreover, it was not so defined in the agreement nor did Judge Tavares' directions so state it. Eastman Dillon therefore was not compelled to operate under Delaware's definition of net asset value.

That definition by the Delaware and a few other courts [24] contemplates only those stock appraisal situations wherein what this court calls the Delaware "block" weighting methodology is used, i. e., the market price, investment value, and net asset value methods (and in some instances dividend value) are independently blocked off and separately valued. Then these "block" values are each weighted to obtain a final valuation figure.[25] When separately valuing the

---

19. Jeffrey v. American Screw Co., *supra* note 18, 201 A.2d at 149; *see* Note, Corporations: Shareholders: Appraisal Rights: Compensation to Shareholders Dissenting from Mergers and Consolidations, 40 Calif.L.Rev. 140, 145–46 (1952) (hereinafter referred to as "Note on Compensation to Dissenting Shareholders").

20. *See* notes 31–35 *infra*, and accompanying text.

21. The Court in Palmer v. Connecticut Ry., 311 U.S. 544, 559, 61 S.Ct. 379, 384, 85 L. Ed. 336 (1941), stated that, "All that can be done [to make a valuation] is to place before the court such facts and circumstances as are available to enable an estimate to be made based upon judgment and not guesswork."

22. 243 A.2d 67 (Del.1968).

23. *Id.* at 71.

24. *See* note 25 *infra* and accompanying text.

25. Brown v. Hedahl's–Q B & R, Inc., 185 N.W.2d 249, 258 (N.D.1971); Tome Land & Improvement Co. v. Silva, 83 N.M. 549, 494 P.2d 962, 965 (1972); Application of Delaware Racing Association, 213 A.2d 203, 214 (Del.1965); *see generally* Note on Valuation of Dissenters Stock, *supra* note 18; Comment, Corporations—Standards of Valuation of Dissenters' Stock Under Appraisal Statutes, 51 Mich.L.Rev. 713 (1953). However, even in the cases mentioned above, the courts noted the difficulties which are inherent in the valuation of stock in each

stock in accordance with the forms of computation used in each "block", the forms of computation for any one "block" should not be commingled with any forms in any other "block." To commingle the forms of computation by which the separate "block" valuations are performed would prejudice the blocked off independence by which the final figure under each "block" should be determined. Such severed independence is required since, as indicated above, the figure reached under each "block" must each then be weighted. After weighting the figures under each "block", the total of such weighted figures becomes the final valuation figure.

Under the "block" approach, then, the capitalization of earnings form of computation can only be used in computing an investment value figure. It cannot again be used in the net asset value figure. Thus the Delaware Chancery Court in Felder v. Anderson, Clayton & Co.[26] found error when the appraiser applied a capitalization of earnings form of computation to determine the net asset value since "[the appraiser's approach] used an element of value [capitalized earnings] to determine the maximum value for another element [asset value]. It seems clear that the fair value of assets at a given date are not necessarily fully reflected in capitalized earnings as of that date . . . . One might turn it around and say that the capitalized earnings formula is unacceptable because it does not 'jibe' with the fair asset value. Could we say there was no

asset value where the capitalized earnings figure was zero?"[27]

However, where the market price, investment value, and net asset value methods are not exclusively used, are not independently valued, and are not weighted, i. e., when the Delaware "block" system is not employed, "net asset value" assumes its more general definition, viz., it is the value of all assets less any claims against such assets.[28]

Under that definition, there are four approaches to the determination of net asset value: book value, reproduction cost, going-concern value, and liquidation value.[29] An appraiser makes a net asset valuation by determining which approach to use with regard to each asset or group of assets. It may be that in one case, such as with equipment, that a reproduction cost value should be applied; in another case, such as with income-producing assets, a going-concern value should be applied. In any case, the appraiser must make the appropriate determination, based on an analysis of the relevant facts.

Here, the appraisers performed their appraisals under the *general* definition of net asset value (as distinguished from the Delaware "block" system). Where the relevant assets were involved in sugar production, such assets were valued on a going-concern basis. This was a valid approach, for where a viable operation exists, courts and scholars generally agree that such assets should be valued on a going-concern rather

case. For example, the North Dakota Supreme Court, after examining the differences in valuation given to the three factors (blocks) by the Delaware courts in a number of cases, concluded, "[I]t is clear from a reading of the [Delaware] cases . . . that no simple valuation formula exists and that each case was decided on its own particular facts." Brown v. Hedahl's–Q B & R, *supra*, 185 N.W.2d at 258.

26. 159 A.2d 278 (Del.Ch.1960).

27. *Id.* at 282; *accord*, Woodward v. Quigley, 257 Iowa 1077, 133 N.W.2d 38, 40, 136 N.W.2d 280 (1965).

28. Black's Law Dictionary (1968 ed.); Tri-Continental Corp. v. Battye, 74 A.2d 71, 74 (Del.1950).

29. Comment, Valuation Problems Created by the Dissenting Stockholder, 5 U.C.L.A. L.Rev. 295, 298–301 (1958) (hereinafter referred to as "Comment on Valuation Problems").

than a liquidation value basis.[30] On the other hand, where the appraisers reasonably found on the facts that certain assets should more properly be appraised on a liquidation value basis, they so appraised such assets.

 In making valuations, and with due deference to the "expertise" [plaintiffs' characterization] of the Del-

aware courts, this court holds that appraisers should *not* be confined in their analysis to rigid methods within only which they may make their determinations,[31] nor that any one method is legally sacrosanct and *must* be used.[32] Rather, the court's basic concern in valuation cases is that the appraisers have considered all relevant value criteria [33] for the express purpose of

30. *See* Comment on Valuation Problems, *supra* note 29, at 303; *also,* Note on Valuation of Dissenters' Stock, *supra* note 18, at 1457; and *also,* Comment, Valuation of Dissenting Stockholders' Shares Under an Appraisal Statute, 23 Mo.L.Rev. 223, 229–30 (1958) (hereinafter referred to as "Missouri Comment on Valuation") :

"The net asset theory may have either of two distinct implications. The first is that the merger situation is to be equated with a dissolution of the corporation. The second might be denominated an adjusted net asset approach in that the shares are to be valued as a continuing interest in a going concern. It is the latter of these two possible interpretations which is the truer determination of the value that is contemplated by the [valuation] statute. The shareholder has bought into a going concern. He has been deprived by majority action of his interest in the active enterprise. And it is for this interest that he should be remunerated. The use of a liquidation value is inappropriate. It makes the merger situation the equal of the dissolution, omitting all of the factors that are incident to the corporation's worth as a going concern. With the exception of the few early cases that have applied a liquidation-type theory, very few courts unequivocally advocate the use of such a system."

31. "The ascertainment of value . . . is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts." Standard Oil Co. v. So. Pacific Co., 268 U.S. 146, 156, 45 S.Ct. 465, 467, 69 L.Ed. 890 (1925). "Fair value is not susceptible of determination by any precise mathematical computation and no one formula or figure is binding or conclusive." Flarsheim v. Twenty Five Thirty Two Broadway Corp., *supra* note 18, 432 S.W.2d at 255; *see generally* Note on Compensation to Dissenting Shareholders, *supra* note 19, at 145. Perhaps the best characterization of the situation may be as follows:

It is said that [valuation] standards may be grouped into two distinct categories. The first group are those values for which a definite mathematical figure can be achieved and includes market value, asset value and earnings capitalization. The other category are those elements which bear upon the worth of a share but cannot be derived by any computation. These may include the future potential of a company, frequency of dividend payments, caliber of management, and the relative position of the company in its industry. These represent vague considerations which are matters of personal judgment of the appraiser. Missouri Comment of Valuation, *supra* note 30, at 228, 232.

32. It is this precise form of assertion that one method should be controlling that prompted the Ohio Supreme Court to overturn a lower court's instruction that one method of valuation should control. Roessler v. Security Savings & Loan Co., 147 Ohio St. 480, 72 N.E.2d 259–261 (1947).

33. Judge Tavares' instruction, too, called for the consideration of *"all* relevant value criteria." (Emphasis supplied.) Even in Tri-Continental Corp. v. Battye, *supra* note 28, 74 A.2d 71, 72, the Delaware Supreme Court stated that "the appraiser and courts must [consider] all factors and elements which reasonably might enter into the fixing of value [such as] market value, asset value, dividends, earnings prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of merger." *Accord,* In Re Olivetti Underwood Corp., 246 A.2d 800, 803 (Del.Ch.1968).

Still, no list of factors is exclusive. The Iowa Supreme Court, after listing several relevant factors to be considered in valuation, went on to say, "It is unwise to attempt to state every factor that may bear on the value of stock in a particular case." Robbins v. Beatty, 246 Iowa 80, 67 N.W. 2d 12, 18 (1954).

finding the value of the stock.[34] Although all such criteria should be considered by the appraisers, only those criteria that are relevant in any particular valuation need be analyzed.[35] This court's primary concern is with the accuracy and equity of Eastman Dillon's appraisal. Consideration of "all relevant factors entering into the determination of value does not mean that any one factor is in every case important or that it must be given a definite weight in the valuation . . . . The relative importance of several tests of value depends on the circumstances."[36] The claimed simplicity and certainty of the Delaware "block" system does not mandate this court—nor did it mandate Eastman Dillon—to adopt its use in this case.

Here, the appraisers determined on legally sufficient grounds that the appraisal of the fair value of the stock of the Plantations could best be achieved by performing their appraisal within the guidelines of the more general definition of net asset value, rather than of the definition established by the Delaware courts. In performing their appraisal, they gave "any benefit of the doubt to the minority [share]holders."[37] This court finds no error arising from the appraisers' decision not to make a liquidation value analysis in using a net asset value method in their appraisal.

■ Having determined that the appraisal of the sugar-producing lands on a going-concern basis in the determination of net asset value was proper, this court also holds that the growing crops and the C and H stock were soundly included as part of the sugar-producing assets, and thus need not be separately valued. Similarly, this court finds that Root correctly gave a valuation to Kauai Storage by including its earnings as part of the income stream in valuing Lihue's sugar-producing assets. All three assets would necessarily be required in the continuity of the business of sugar production.

■ This court also finds that the appraisers did consider the value of the 50 acre parcel involved in the Princeville transaction and that Root properly evaluated it. The total consideration to be paid to Lihue by Eagle County Development Corporation for the entire transaction was $8,800,000. Root correctly assumed that the value of the 50 acre parcel was the difference between the $8,800,000 and $8,695,000 which was the consideration for all the land except the 50 acres.

■ This court has no problem in disposing of plaintiffs' other arguments which deal with the application of taxation by the appraisers. Plaintiffs argued that the appraiser should not have reduced the values of the non-sugar-producing assets by deducting a capital gains tax. Here, where the non-sugar-producing assets were valued on a theoretical liquidation basis, which basis the appraiser had determined would bring the highest return to those assets, the capital gains tax would apply to determine their value.

■ Finally, plaintiffs argued that the appraisers should have used a 48 percent tax rate and not the 50 percent which they had used. The appraiser testified that this was the customary, average figure relied upon by invest-

34. "[The consideration of all factors should be] limited in their application to the single and exclusive and final purpose of finding and deciding fair market value [of the stock]." General Grain, Inc. v. Goodrich, 221 N.E.2d 696, 701 (Ind. App.1966).

35. Sterling v. Mayflower Hotel Corp., 93 A. 2d 107, 115 (Del.1952) ; Woodward v.

Quigley, *supra* note 27, 133 N.W.2d at 40.

36. Sterling v. Mayflower Hotel Corp., *supra* note 35, 93 A.2d at 115.

37. Eastman Dillon Appraisal Report, *supra* note 14, at 3.

ment bankers. Further, the 50 percent rate appears to be fair in this case. The applicable federal tax rate in the periods involved was 22 percent on the first $25,000 and 48 percent on any additional income. The applicable Hawaii corporate income tax was 5.85 percent on the first $25,000 and 6.435 percent on the balance. Assuming $1,000,000 of taxable income and allowing the lower rate on the first $25,000 and a deduction for state income tax paid, the effective income tax rate for Hawaii corporation including the Plantations would be 50.48 percent.

This court finds that the appraisers fully and correctly performed their duty as provided by the Settlement Agreement and in accord with Judge Tavares' instructions, and that there was no error in any of the Eastman Dillon appraisals.

The motion to set aside the appraisals is DENIED, and the appraisals will take effect under the terms of the Settlement Agreement.

Defendants will prepare the judgment.